**AMICABLE LIFE INS. CO. v. O'REILLY.**

No. 2983.

Court of Civil Appeals of Texas. Beaumont.

July 14, 1936.

Rehearing Denied Oct. 7, 1936.

the Insured be caused by an accident, to pay to the Beneficiary named in the Policy $1,000.00, which sum is equal to and shall be in addition to the Principal Insurance." A condition of this supplemental agreement was that "this Double Indemnity Benefit shall not be paid if it shall appear that such death resulted, directly or indirectly, wholly or in part, * * * from police duty in any * * * police organization." Only the conditions of "double indemnity" were put in issue. On the trial it was agreed that the policy of insurance in controversy was in force at the time of the death of Edward James O'Reilly; that proof of death and demand were made sufficient to entitle appellee to the statutory penalty and attorney's fees, if such be recoverable; that $250 was a reasonable attorney's fee, if any attorney's fee was recoverable; that appellant has tendered and been willing to pay the principal coverage of the policy in the sum of $1,000; that the issue in this case "lies solely upon the liability of the defendant company ·to pay double indemnity under the double indemnity provision of the policy"; that, for the purpose of this trial only, it was agreed by all parties that the arrest of Edgar Eskridge by Edward James O'Reilly on the day ·preceding O'Reilly's death was a legal arrest. On the trial to the court without a jury, it being made to appear that appellee had accepted the tender made by appellant of the principal coverage of the policy, judgment was entered in her behalf for $1,000, the amount of coverage under the double indemnity provision copied above, with judgment for attorney's fees, damages, etc. In support of its judgment the lower court filed the following fact conclusions:

"Third. I find that the death of the insured, Edward James O'Reilly, was accidental and resulted directly, independently and exclusively of all other causes from bodily injuries effected solely through external, violent and accidental causes, towit, as the result of a gun-shot wound inflicted by Edgar Eskridge.

"Fourth. I find that Edward James O'Reilly was shot by Edgar Eskridge on May 29th, 1935, and as the result of such accident died instantly after being so shot.

"Fifth. I find that on the 28th day of May, 1935, Edward James O'Reilly was the Chief of Police of the City .of Orange and in the performance of his official

V. H. Stark, of Orange, and O. F. Jones and McClellan, Lincoln & Williams, all of Waco, for appellant.

E. L. Reid and H. M. Kinard, both of Orange, for appellee.

WALKER, Chief Justice.

On the 31st day of August, 1935, appellee, Mrs. Daisy Bell O'Reilly, instituted this suit in the district court of Orange county, against appellant, to . recover "double indemnity" insurance under the provisions of an insurance policy issued by appellant to Edward James O'Reilly on the 19th day of May, 1935, in which she was named "beneficiary, wife of insured." The principal coverage of the policy was for $1,000; by à supplemental agreement, attached to the policy, appellant agreed that, "should the death of

duties arrested Edgar Eskridge for unlawfully carrying a pistol and took him before the County Attorney of Orange County, Texas; upon the statement of the said Edgar Eskridge, who at said time was a Baptist Preacher, that he would not again carry deadly weapons until he had a right to do so, no charges were preferred against him and he was released from custody.

"Sixth. I find that after Edgar Eskridge was released from custody by Edward James O'Reilly, the two of them shook hands and parted in a friendly manner; and in this connection, I further find that upon releasing the said Edgar Eskridge from custody on May 28th, 1935, the said Edward James O'Reilly had completely performed his police duty.

"Seventh. I find that on May 29th, 1935, during the noon hour while the said Edward James O'Reilly was standing on a street corner in the City of Orange, Texas, talking to a friend, the said Edgar Eskridge drove in an automobile close to the street corner on which the said Edward James O'Reilly was standing and without either words or provocation and without the said Edward James O'Reilly being aware of his presence, the said Edgar Eskridge stopped his automobile and immediately shot and killed said Edward James O'Reilly with a shot gun.

"Eighth. I find that the death of the said Edward James O'Reilly did not result directly or indirectly, wholly or in part, from police duty in any military, naval or police organization and that such death did not occur under any circumstance, condition or state of facts excepting defendant from liability under the terms of the policy issued by it to Edward James O'Reilly."

The following is all the testimony offered by appellee on the trial of the case in lower court:

First, the policy of insurance; only the provision of double indemnity copied above is material to this appeal.

Second, the witness W. L. Shepherd; the lower court correctly summarized all the pertinent testimony of this witness by the fifth, sixth, and seventh fact conclusions.

Third, the witness James Neff, who testified as follows, questions and answers reduced to narrative:

"I am James Neff; county attorney of Orange County. I held that office during the month of May, 1935. I knew Ed J. O'Reilly during his lifetime. At the time of his death and for sometime prior thereto he was Chief of Police of Orange. I knew Rev. Edgar Eskridge. I recall on the day before Mr. O'Reilly was slain in Orange that he brought Eskridge to my office in the courthouse. He brought him there to let him show me his credentials for carrying a pistol. O'Reilly didn't say anything in the presence of Eskridge about having arrested him for carrying pistols. There is some of that I don't recall. Mr. O'Reilly called me that morning about eight o'clock; I told him I would see him and I came to town. I went to the City Hall and saw him on the city lot. At that time the preacher was sitting on Main Street in his car. And O'Reilly and Eskridge came to my office and after they came in O'Reilly searched him in my presence; and so we discussed the matter of Eskridge carrying a gun and I asked to see his authority and he told me about his authority but he never could produce any at all, and he then promised to take his guns home and leave them and he didn't have a gun on in my office, but he promised he would take his guns home and leave them and O'Reilly and Eskridge shook hands and apparently parted as friends. O'Reilly left my office before Eskridge did. I don't know of any other meetings of those parties from that time until Eskridge killed O'Reilly the next day. That was about eight o'clock on the morning before the day he was killed. The killing was about one o'clock P. M. of the following day. Eskridge was released from custody in my office; and after that he and O'Reilly shook hands and the matter was over so far as I know, at that time.

"I don't know where the preacher's guns were when they came to my office; I did not see them. From what was said Mr. Eskridge had been carrying guns—pistols on or about his person, which led to his arrest by the Chief of Police. I can't say that Mr. Eskridge said anything about what he had been doing which led to his arrest.

"The question of the raid on the Silver Slipper was not mentioned by him when he was down there, I don't know, I don't believe it was. If we talked about that I don't remember it Judge; I don't remember O'Reilly saying anything about it when he was in there; I don't remember

them talking about that. I don't know where the preacher's guns were when they were in my office. I never had the guns, I never saw them. I did not require an affidavit on his part that he would not carry arms. He did not sign one in my presence; I don't know anything about him signing one. That arrest was occasioned by the fact that Eskridge had been carrying his guns. That is all I know.

"Nothing was said about the Silver Slipper raid that the preacher made that I can recall; the Silver Slipper was not in the jurisdiction of Mr. O'Reilly as Chief of Police. He had nothing to do with the Silver Slipper."

Fourth, the following letter by W. A. Blair, appellant's vice president, to W. A. Mitchum, its local agent at Orange:

"June 5, 1935.
"In re: Policy No. 38414
"Edward J. O'Reilly, Deceased.
"Mr. W. A. Mitchum
"Orange, Texas.
"Dear Mr. Mitchum:
"With reference to your letter of June 1 regarding this claim, will advise that in addition to the face of the policy of $1,000.00 the beneficiary will be entitled to the Double Indemnity feature which will make the claim $2,000.00. There will be deducted a semi-annual premium of $15.02 to cover balance of the current year's premium."

Mr. Blair testified that when this letter was written he knew nothing of the circumstances attending the death of Mr. O'Reilly.

### Opinion.

■ We sustain appellant's proposition that the judgment of the lower court is without support in the evidence. It is now the law of this state that the beneficiary of a life insurance policy must allege and prove that the risk resulting in the maturity of the policy was not one excepted from its general provisions. Travelers' Ins. Co. v. Harris (Tex.Com.App.) 212 S.W. 933; Washington Fidelity Nat. Ins. Co. v. Williams (Tex.Com.App.) 49 S.W.(2d) 1093; International Traveler's Ass'n v. Bettis, 120 Tex. 67, 35 S.W.(2d) 1040; Coyle v. Palatine Ins. Co. (Tex.Com.App.) 222 S. W. 973; American Ins. Co. v. Maddox (Tex.Civ.App.) 60 S.W.(2d) 1074; American Ins. Co. v. Delaney (Tex.Civ.App.) 80 S.W.(2d) 1085. So, appellee rested under the burden of showing by a preponderance of the testimony that the death of Edward James O'Reilly did not result "directly or indirectly, wholly or in part * * * from police duty in any * * * police organization."

The evidence was conclusive that O'Reilly's death did not result "directly" from police duty; that follows because, at the time he was killed by Eskridge, he was not in the discharge of the duties of his office as chief of police. He was not making any effort to arrest Eskridge, he did not even know that Eskridge was in his presence, nor that he was preparing to shoot him. Under this statement it follows that appellee discharged the burden resting upon her of showing that the death of her husband did not result directly from police duty.

■ But that cannot be said of the issue presented by the condition that O'Reilly's death did not result "indirectly" from police duty. The word "indirectly" cannot be treated as surplusage; this word must be given its meaning recognized in the adjudicated cases. Webster's New International Dictionary defines this word as follows: "Indirect: * * * not direct; specif.: (a) not straight or rectilinear; deviating from a direct line or course; circuitous; oblique; as, an indirect road. 'Indirect, crooked ways.' Shak. (c) not leading to an aim or result by the plainest course or method or by obvious means, but obliquely or by remote means; roundabout * * *. (d) Not resulting directly from an act or cause, but more or less remotely connected with or growing out of it; as indirect results."

Corpus Juris, vol. 31, p. 884, gives the following definition: "Indirect: Not direct in relation or connection; not having an immediate bearing or application; not related in the natural way."

The word "indirectly" was before the Dallas Court of Civil Appeals in Farmers' State Bank v. Mincher, 267 S.W. 996. Citing that definition, the Supreme Court of Nebraska in State v. Pielsticker, 118 Neb. 419, 225 N.W. 51, 52, said: " 'Indirectly' signifies the doing by an obscure *circuitous method* something which is prohibited from being done directly, and *includes all methods of doing the thing prohibited except the direct one.* Farmers' State Bank v. Mincher (Tex.Civ.App.) 267 S.W. 996."

For other definitions, see Southern Traction Co. v. Gee (Tex.Civ.App.) 198 S.W. 992.

We quote as follows from Runyon v. Western & Southern Life Ins. Co., 48 Ohio App. 251, 192 N.E. 882, 883, where the issue was very similar to the issue in this case:

"The sole question for determination is whether the terms of the policy entitle the plaintiff to recover for the death of the deceased, which was caused by a fire in the Ohio penitentiary, where he was confined for the commission of a felony. The defense in question alleges that the policy provided for the payment of the amount stipulated if death resulted from bodily injury, 'unless such death be caused by or be attributed to as the result, directly or indirectly, of any violation of law by the insured.' * * * It is true that the proximate cause of the death of the deceased was the fire. *The indirect cause of his death was his unlawful act which caused his confinement in the penitentiary, resulting in his death by means of the fire.* * * *

"Under a clause of the kind contained in the policy in this case, the courts hold that the insurer is not liable if the policy expressly excludes liability for an injury of which a violation of law is either the proximate or remote cause or the condition producing the injury. Duran v. Standard Life & Accident Ins. Co., 63 Vt. 437, 22 A. 530, 13 L.R.A. 637, 25 Am. St.Rep. 773.

"As the action is founded on contract it is necessary to construe the terms used in the policy. If the word 'indirectly' was omitted, leaving the word 'directly' without any qualifying word or phrase, the policy might well be construed as requiring the violation of law to be the proximate cause of death; but the word 'indirectly' used in the policy must be given its usual meaning.

" ' "Indirect," as defined by the Century Dictionary and Cyc., is "not direct in relation or connection; not having an immediate bearing or application; not related in the natural way," etc., which is not the same meaning as direct, nor equivalent thereto.' Southern Traction Co. v. Gee (Tex.Civ.App.) 198 S.W. 992, 993, 31 Corpus Juris, 884; 22 Ruling Case Law, 218.

"The leading authority construing the phrase used in this policy is the English case of Coxe v. Employers' Liability Assurance Corp., (1916) 2 K.B. 629. In that case by a policy of insurance, the deceased, a reserve military officer, was insured against death within the kingdom 'directly or indirectly caused by, arising from or traceable to * * * war,' the realm then being in a state of war. While in England walking along a railroad track to inspect some guards he was killed by a train. It was held that the words 'directly or indirectly' could not be reconciled with the maxim 'causa proxima non remota spectatur' (the direct and not the remote cause is considered), which would have been applicable had the words not been in the condition, and, the deceased having been placed in a position of special danger by reason of his military duties consequent upon the war, it was proper to find that the death was indirectly caused by the war. This case is quoted in the text of Porter's Law of Insurance (7th Ed.) 473.

"The deceased was in the penitentiary by reason of his violation of law. Had he not violated the law, he would not have been there and been subjected to the hazard of the fire. *His violation of law was the indirect cause of his death. By the very terms of the policy a recovery is precluded.*"

■ Under the authorities cited, the evidence raised the issue that the arrest of Eskridge by O'Reilly on the 28th day of May was the indirect cause of O'Reilly's death on the 29th day of May. And there is not a circumstance in the record rebutting the prima facie case in favor of appellant.

It thus appears that appellee, by her own testimony, raised the issue bringing her husband's death within the exception to the double indemnity coverage of the policy of insurance in controversy.

It follows that the judgment of the lower court must be reversed and the cause remanded for a new trial.