**BULL v. SUN LIFE ASSUR. CO. OF CANADA (two cases).**

Nos. 8369, 8370.

Circuit Court of Appeals, Seventh Circuit.

March 15, 1944.

Rehearing Denied April 7, 1944.

Eugene R. Johnson, Frank T. Miller, and Oscar P. Westervelt, all of Peoria, Ill., (Miller, Westervelt, Johnson & Thomason, of Peoria, Ill., of counsel), for Sun Life Assur. Co. of Canada.

Clarence W. Heyl, Oswald D. Vespa, and Chester L. Anderson, all of Peoria, Ill., for Bull.

Before MAJOR, KERNER, and MINTON, Circuit Judges.

MINTON, Circuit Judge.

Ruth P. Bull recovered judgment in the District Court for the face value of a policy of insurance issued by the defendant, the Sun Life Assurance Company of Canada,

upon the life of her husband, Richard Bull. The defendant has appealed from the judgment.

The only question presented here is one of law, that is, the proper construction of the insurance contract. The policy at the time of its issuance was amended by endorsement to provide as follows:

"Death as a result, directly or indirectly, of service, travel, or flight in any species of aircraft, as a passenger or otherwise, is a risk not assumed under this policy. * * *"

The defendant contends that the death of Richard Bull was within the terms of this provision, and that therefore it is not liable. The facts are as follows:

On October 14, 1939, Richard Bull made application to the defendant for the policy of insurance in suit. At that time, he was a Naval Aviation Cadet in training at Pensacola, Florida. The defendant knew that he was an Aviation Cadet and that he intended to continue in aviation after his period of training. Knowing these facts, the defendant required Richard Bull to sign the endorsement containing the aviation provision and to agree that this provision should become a part of the contract of insurance.

On February 5, 1942, Richard Bull, who was then a Lieutenant (j. g.) in the United States Naval Reserve, was commanding officer and alternate pilot of a seaplane which was engaging in routine patrol duty in the South Pacific. Coming across some Japanese ships at anchor in a small harbor, Lieutenant Bull and his crew commenced bombing them, but anti-aircraft fire and Japanese Zeros peppered their plane. The port motor was shot out, gasoline poured. into the hull, filling the plane with fumes, and ten or fifteen miles from the scene of the encounter they were forced to make a landing on the water, 500 to 1,000 yards off the island of Amboina, Dutch East Indies. The plane did not crash, but after landing it could not have flown again without repairs. The motors were immediately cut off and for ten minutes the plane was afloat

with its anchor overboard. Gasoline was still escaping from the gas tanks into the hull of the plane and spreading upon the surrounding water so that the whole area was in an explosive condition.

Two of the plane's crew, Hargrave and Nelson, with a wounded comrade, debarked from the plane in a rubber boat. Hargrave testified by deposition that Lieutenant Bull was inside the plane the last time that he saw him. Nelson testified by deposition that the last time he saw him, he was outside the plane on the fuselage, trying to launch a rubber boat. While Lieutenant Bull was in that position, attempting to escape from the immobile, disabled plane, a Japanese seaplane dived to within thirty to fifty feet of the crippled plane, strafing it and the water around it. According to Nelson, Lieutenant Bull was exposed to this machine gun fire. To protect themselves, Nelson and Hargrave abandoned their life raft and dived into the water. The first strafing not having sunk the disabled plane, the enemy plane circled and returned for a second attack. While the witnesses were under the water, they heard an explosion, and when they emerged, the area where the plane had been was in flames, with only the tip of a wing still visible. Lieutenant Bull was never seen thereafter. Whether he was on the fuselage at the time of the second strafing does not appear.

The question presented to us is whether Lieutenant Bull met his death, "as a result, directly or indirectly, of service, travel, or flight" in that seaplane. This is a legal question that requires us to construe the contract of insurance. It is elementary that such contracts are strictly construed against the insurance company. Unless the clear and reasonable construction of this contract supports the contention of the defendant, we must affirm the District Court.

Many cases are cited in the briefs, but none of them seems to meet the exact situation presented here.[1]

Our problem is to determine the intention of the parties. In October, 1939,

[1] The cases most nearly in point which we have been able to find are two arising out of the San Francisco earthquake of 1906. These cases, Commercial Union Assurance Co. v. Pacific Union Club, 9 Cir., 169 F. 776, and Pacific Union Club v. Commercial Union Assurance Co., 12 Cal.App. 509, 107 P. 728, 729, involved the construction of a fire insurance policy which contained the following provision:

"This company shall not be liable for loss caused directly or indirectly by invasion, earthquake, * * *."

The day after the earthquake, fire broke out in the Pacific Union Club. Because the water mains had been broken

when this policy was applied for, war was raging in Europe at blitzkrieg tempo. In the Far East, war had been going on for two years, and our relations with Japan were strained. We were making preparations to expand our defense program. Under such circumstances, Lieutenant Bull had entered the armed services of his country. He was a Naval Aviation Cadet when he applied for the policy and when it was issued. The defendant knew that he intended to continue in such service. With such knowledge, the defendant drew the policy and determined the risk it would assume. It wrote its own ticket. The aviation clause we have set forth was inserted in the policy. No war clause was inserted. It is apparent, therefore, that the defendant was willing to and did assume all risks of war not connected with service, travel, or flight in aircraft. Was the death of Lieutenant Bull under the circumstances a risk of war or of aviation? Was his death the result, direct or indirect, of service, travel, or flight in aircraft, or was it a war risk, free from aviation?

It is the defendant's contention that Lieutenant Bull's death was the indirect result of service, travel, or flight in that patrolling seaplane. Let us consider the case from this view. The seaplane had landed and was so disabled that it would never fly again without repairs. It was anchored, and the engines had been stopped for nearly ten minutes. Service, travel, and flight in that plane had come to an end. Lieutenant Bull, as the evidence showed, was out upon the fuselage trying to inflate a rubber boat for the purpose of escape. While he was in that position, the jury had a right to infer, a Japanese plane shot him and from those bullet wounds he died. Was his death a result of aviation or of war? What connection, direct or indirect, did his death have with that disabled aircraft which lay in the water, useful only as a raft? The sole connection was that Lieutenant Bull arrived at this place by way of aircraft. But he was not injured in the arrival. He was not injured by service, travel, or flight in the aircraft.

He was killed after those things had terminated. If his arrival at this place by aircraft is to be construed as an indirect cause of his death, then Lieutenant Bull would never have been protected by this policy at any place to which he came by aircraft. Suppose that he had arrived by plane at an airport in peacetime and that, as he was crawling out of the plane after landing, a personal enemy had shot and killed him. Would any reasonable man contend that his death was a result, direct or indirect, of service, travel, or flight in that plane?

War risks not connected with aviation were as clearly assumed as this peacetime risk. No construction should be given the contract which would make it applicable if a personal enemy shot the insured but inapplicable if a public enemy shot him. In neither case was death *the result,* direct or indirect, of service, travel, or flight in aircraft. The parties must have intended that there should somewhere be a point at which the insured would become disengaged from service, travel, or flight in that seaplane. Suppose Lieutenant Bull had reached the island and that the Japs there had shot him. Would that have been a death not covered by the policy? Such a construction would be unreasonable. Suppose that he had succeeded in launching his rubber boat and that at some point between the plane and the shore he had been shot by the Japs. Would that death have been excluded by the provision we are now considering? We think not.

Does the fact that he was upon the fuselage of that wholly disabled, immobilized plane which rested at anchor in the water, useful only as a raft, create such a distinction between this and the foregoing illustrations as to tie up his death with service, travel, or flight in that seaplane? We think not.

■ We hold that disengagement from service, travel, and flight in that seaplane had taken place in the case at bar, and that Lieutenant Bull's death had no connection, directly or indirectly, with service, travel, or flight in that seaplane within the meaning of the policy. Where

by the earthquake, water could not be obtained to fight the fire, and the property was destroyed. The insurance company contended that the failure of the water supply was due directly or indirectly to the earthquake, and that therefore it was not liable. The courts in both cases, however, denied the contention of the insurance company on the ground that it was not reasonable to suppose that the parties to the contract meant by this provision to exempt the company from liability where the connection between the earthquake and the fire was so remote.

the service, travel, and flight in the aircraft had definitely ended, and the only connection the insured had with the plane at the time he met his death at the hands of a strafing Jap was that he had arrived by plane at the place where the Jap shot him, his death was too remote to be considered the result, direct or indirect, of service, travel, or flight in an aircraft. We think the true intent of the parties was to exclude the risks of aviation and to include the risks of war. The death in this case was due solely to dangers inherent in a war risk.

For another reason, we do not think the contention of the defendant is valid. The provision of the policy relied upon as a defense by the defendant becomes operative only where the insured meets "death *as a result,* directly or indirectly, of service, travel, or flight in any species of aircraft." (Italics ours.) Death in this instance *resulted directly* from the strafing by the Jap plane. The evidence clearly supports that view. The policy does not say that it shall not apply if the death is *contributed to* directly or indirectly by the service, travel, or flight in the aircraft. The policy deals with results and not causes or contributing causes. Aviation may have been a contributing cause, but that did not make the death an indirect result of aviation. No risk of aviation resulted in death. A risk of war resulted in death. That was a risk not excluded by the policy.

In any view of the case, the defendant must fail. Looking at the contract to determine whether service, travel, or flight in the aircraft resulted in the insured's death, we must conclude that it did not. The facts in this case so predominantly and effectively characterize his death as one due to war risk that the remote connection between his death and service, travel, or flight in an aircraft must be considered wholly ineffectual to change that characterization.

When we consider results that produced death, as provided in the policy, and not contributory causes, which were not the limiting terms of the provision, it is clear that the contract does not support the contention of the defendant.

The judgment in No. 8369 is affirmed.

There was a cross-appeal (No. 8370) perfected by the plaintiff involving the policy's incontestability clause. Consistent with the disposition of the appeal in No.

8369, the cross-appeal need not be sustained, and the judgment is affirmed.

MAJOR, Circuit Judge (dissenting).

The oft repeated adage that a hard case makes bad law receives renewed impetus from the majority opinion. The exclusion clause is written in plain and unambiguous language. Even the able counsel who represents the plaintiff does not contend to the contrary. This being so, there is no room for construction. The situation merely requires a determination as to whether the exclusion clause is applicable to the facts.

While I recognize that a dissenting opinion ordinarily is futile, there are cases where the importance of the court's action is such as to justify it. This is one of such cases. The giving effect to the plain terms of a contract, especially an insurance contract, is a matter of vital public importance. A failure of courts to give such effect may temporarily concern only the insurer, but in the long run it will do more harm to those seeking insurance protection by making it more difficult to obtain.

The opinion erects and demolishes a number of straw men. The one which appears to be the underlying foundation for the conclusion reached arises from the query, "Was his death the result of aviation or of war?" The answer to this question is as irrelevant as the query itself. There cannot be the slightest doubt but that the insured's death was the result of war. The question is whether his death was the result "directly or indirectly of service, travel, etc." while engaged in such war. Other straw men appear in the form of hypothetical questions, the answers to which are not helpful because the questions are predicated upon facts dissimilar to those of the instant case. The question is posed and answered that the exclusion clause would not have applied if the insured had been shot by a personal enemy at an airport in peacetime after crawling from the plane. Perhaps not. A more pertinent inquiry, however, would be: If the insured had known that this imaginary enemy was at the airport, armed for the purpose of killing him, and with this knowledge landed and was shot, would any reasonable person contend that his death was not the result, either directly or indirectly, of his travel in such plane? Another hypothetical poser, "Suppose Lieutenant Bull

had reached the island and the Japs there had shot him?" takes us still further into the realm of speculation. I suppose the answer to that one would be that if death was so remotely connected with flight, etc., as not to result "directly or indirectly" therefrom, the exclusion clause should not be applied. It will be time enough, however, to decide that question when such a case is before us.

Returning to the instant case, another fallacy is that the exclusion clause became inoperative when the seaplane landed upon the water. This approach also eliminates from the exclusion clause the words "directly or indirectly." It is the same as saying that the exclusion clause is applicable only where death results while in flight, etc. Furthermore, if defendant is liable because death resulted from war, as the majority seems to hold, it would be immaterial whether such death resulted before or after the plane landed. In fact, the reasoning of the opinion would be just as plausible if the insured had been shot by the Japs while in the air. The flight itself being comparatively free from danger, it could be contended, just as it is here, that death was not the direct or indirect result thereof but that it was caused by Japanese bullets.

The result reached by the majority ignores the realities of the situation. The insured, together with other members of the crew in performance of a war duty, sought the enemy and engaged in aerial combat in which the seaplane was disabled and forced down. This was an ordinary and known danger incident thereto. Within a few minutes the same enemy, in continuation of such combat, again attacked the plane in its disabled condition, during which attack the insured was killed. In my view, there is no escape from the conclusion that death under such circumstances was the result "directly or indirectly" of the flight which had been so shortly and suddenly terminated. It is no answer to say that the exclusion clause is inapplicable because the immediate or proximate cause of death was the Japanese attack. Such answer certainly eliminates the word "indirectly" and perhaps the word "directly."

The opinion not only ignores the plain language of the contract and the realities of the situation, but also many cases of striking analogy.[1] Such cases may be divided into two classes, (1) those which support the theory that death resulted directly from the flight, etc., and (2) those which support the theory that death resulted indirectly from the flight, etc. Among the first class of cases are Neel et al. v. Mutual Life Ins. Co. of New York, 2 Cir., 1942, 131 F.2d 159; Pittman et al. v. Lamar Life Ins. Co., 5 Cir., 17 F.2d 370; Wendorff v. Missouri State Life Ins. Co., 1927, 318 Mo. 363, 1 S.W.2d 99, 57 A.L.R. 615; and Blonski v. Bankers' Life Co., 209 Wis. 5, 243 N.W. 410. It is pertinent to note that in all these cases the language of the exclusion clause was less favorable to the insurer than that of the instant case. Also, the facts of such cases were less favorable.

In the Neel case, liability was excluded where "death resulted from * * * participation in aeronautics." The insured, a pilot, landed his plane in the Atlantic Ocean where his body was found sixteen days later, floating in the water. It was shown that death was caused by drowning. The court, in holding that death resulted from "participation in aeronautics," stated (131 F.2d at page 161):

"It would not have occurred when it did if he had not taken the flight in the aeroplane, and liability for death resulting from such a flight was exactly what was excepted from the coverage of the policy. In other words, the flight, and not the drowning, was the predominant cause of death."

1 Only two cases are cited in support of the opinion. Commercial Union Assurance Co. v. Pacific Union Club, 9 Cir., 169 F. 776, and Pacific Union Club v. Commercial Union Assurance Co., 12 Cal.App. 509, 107 P. 728. It is said that these cases are most nearly in point. In my view, they are of little, if any, value. There, the fire was not caused directly or indirectly by an earthquake, and it was not so contended. In fact, the opinions do not disclose what caused the fire. It was held that the lack of a water supply occasioned by the earthquake was not within the exclusion clause and therefore it could not be relied upon. The court in 169 F. 776, 777, said:

"We can understand, of course, that a failure to keep a supply of water on hand by one who is obligated to do so may subject that one to damages for the wrong in favor of the aggrieved party; but we cannot understand how a nonexistent supply of water can be either the moving cause of a fire, or a link in any chain of moving causes."

So in the instant case death resulted from the flight and it is of no consequence that it occurred subsequent to the landing of the plane on the water. Unless the parties intended to exclude liability under such circumstances, the clause is meaningless.

In the Pittman case, the exclusion clause was similar to that in the Neel case. There, the insured, while on the ground after the plane had landed and while ostensibly on the way to his parked automobile, was struck by the plane's propeller and killed. The court, in holding that death resulted from participation in aeronautical activity, on page 371 of 17 F.2d stated:

"The aeronautic activities of one who takes such a trip do not begin or end with the actual flight, but include his presence or movements in or near to the machine incidental to beginning or concluding the trip. * * * We are of [the] opinion that his presence at the place where he was killed was so immediately connected with and incidental to the airplane trip he took as to require the conclusion that his death occurred while he was participating in an aeronautic activity."

It will be noted that the holding of the majority in the instant case that flight ended when the plane landed on the water is squarely in conflict with the holding in the Pittman case. Also, that case furnishes strong support for defendant's contention that death resulted from flight, etc., within the language of the exclusion clause.

In the Wendorff case, the Supreme Court of Missouri went even further in applying a similar exclusion clause in an accident policy. The court stated (page 102 of 1 S.W.2d):

"In the same way, if a flight is interrupted by mechanical trouble necessitating an involuntary, or forced, landing, the interval during which the craft is supported by the watery element instead of the air is as much a part of the flying trip as any other. We are clearly of the opinion that the clause in controversy applies to aircraft in the situation shown to have existed in this case."

Here is another case in conflict with the view that the landing of the plane on the water ended the flight.

In the Blonski case, the Supreme Court of Wisconsin decided that the insured was "engaging or participating * * * in aviation * * *," within the meaning of an exclusion clause. In this case the insured was struck by the propeller of a plane, which he was spinning for the purpose of starting the motor. The court, in deciding that he was participating in aviation within the meaning of the exclusion clause, quoted from the Pittman case, supra, to the effect that aeronautic activities "do not begin or end with the actual flight, but include his presence or movements in or near to the machine incidental to beginning or concluding the trip." So here is another court which, by implication at least, has held contrary to the majority view.

If there be any room for escape, however, from a holding that death resulted directly from flight, etc., there remains to be considered the word "indirectly." So far as I can gather from the opinion, this word is eliminated on the theory that the parties could not have intended its ordinary meaning. There is a long line of cases, however, where the courts have not felt so free to disregard a word of such common usage in contracts and other instruments.

In Baker & Conrad, Inc., v. Chicago Heights Construction Co., 364 Ill. 386, on page 394, 4 N.E.2d 953, on page 958, the court stated:

"The word 'indirectly,' used in the section, cannot be ignored. It obviously was used advisedly from the fact that it occurs in the phrase 'directly or indirectly.'"

In Feehrer et al. v. Fidelity & Casualty Co., 188 Ill.App. 398, the court considered a provision in a plate glass policy that excluded liability for loss resulting directly or indirectly from inundation. Parties rowing a boat while the street was filled with water collided with the plate glass and broke it. The court, contrary to plaintiff's contention, held that such collision was the indirect result of the inundation. The court stated (188 Ill.App. at page 402):

"A result may indirectly follow from certain acts or conditions without being the proximate cause, yet they are or may be the indirect results."

In Amicable Life Insurance Co. v. O'-Reilly, Tex.Civ.App., 97 S.W.2d 246, 247, the court had before it an insurance contract which excluded liability if "death resulted, directly or indirectly * * * from police duty in any * * * police organization." The insured was Chief of Police, and in the performance of his official duties arrested one Eskridge for carrying a pistol. The latter was released,

and at a later date, without either word or provocation and without the insured being aware of his presence, shot and killed the insured. The question before the court was the meaning of the words "directly [and] indirectly." The court held that the insured's death did not result directly from police duty but that "the word 'indirectly' cannot be treated as surplusage; this word must be given its meaning recognized in the adjudicated cases." The court concluded that the insured's death was the indirect result of police duty.

In Runyon v. Western & Southern Life Ins. Co., 48 Ohio App. 251, 192 N.E. 882, 883, an insurance contract relieved the insurer from liability where death resulted "directly or indirectly, from violation of law by the insured." The insured was found guilty of a violation of law and was confined in the Ohio penitentiary. While so confined, he died as a result of burns received in a fire at the penitentiary. In a suit upon the insurance contract, the court sustained defendant's contention that death was due indirectly to a violation of law. The reviewing court agreed with plaintiff's contention that the fire was the proximate cause of the insured's death, but nevertheless held that the indirect cause of his death was his unlawful act which caused him to be confined in the penitentiary, and that by the terms of the policy recovery was precluded.

In Szymanska v. Equitable Life Insurance Co., 7 W. W. Harr., Del., 272, 183 A. 309, the word "indirectly" contained in an exclusion clause of an insurance contract was construed in the same manner as in the Runyon case.

Another pertinent case is Coxe v. Employers Liability Assurance Corp., 1916, 2 K.B. 629. There, the insurance policy sued on provided that it did not insure against death "directly or indirectly caused by * * * war." The insured, a soldier, while in the course of his military duty, was walking through a railroad yard for the purpose of visiting guards and sentries posted at various points along the line. He was accidentally killed by a train. Upon suit by the beneficiary, it was contended by the defendant that the insured's death was either directly or indirectly caused by war. The court so decided.

The Supreme Court of Utah has also considered and given effect to the word "indirect," as used in an insurance con-

tract. Browning v. Equitable Life Assur. Soc., 94 Utah 570, 80 P.2d 348.

So, in each of these cases, the loss insured against was the indirect result of that excluded from the coverage, although the proximate or immediate cause was the act of a third party or an intervening agency. In the Feehrer case, the indirect cause was inundation; the proximate cause the collision. In the Amicable Life Insurance Company case, the indirect cause of death was police duty; the proximate cause the shooting by another party. In the Runyon case, the indirect cause of death was a violation of law; the proximate cause fire in the penitentiary. In the Coxe case, the indirect cause of death was war; the proximate cause the result of being run over by a train. Applying the rationale of these cases to the instant one, a holding is required that death resulted "indirectly" from flight, etc., even though the immediate and proximate cause was the Japanese attack.

It follows, so I think, that the court below erred in its refusal to direct a verdict for the defendant, and for that reason the judgment should be reversed.