GREEN v. MUTUAL BEN. LIFE INS. CO.
No. 4001.

Circuit Court of Appeals, First Circuit.
July 6, 1944.

Edmund Burke, Oscar H. Brinkman and Hale & Dorr, all of Boston, Mass., for appellant.

F. H. Nash and Bailey Aldrich, both of Boston, Mass., for appellee.

Before MAGRUDER, MAHONEY and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

This complaint by the beneficiary of an insurance policy was met by the defense that the insured's death was brought about by the operation of an excepted risk, and that liability was therefore limited to the amount of the reserve. The plaintiff claimed a jury trial. Subsequently, however, the parties filed a stipulation of facts, and each party moved for summary judgment. On December 17, 1943, the District Court entered judgment for the plaintiff in the sum of $207.15, the amount of the reserve. The plaintiff has appealed from this judgment, contending that the insurer should have been held liable for the full amount of the policy.

On March 15, 1941, G. H. Bartlett Green, III, the insured, in Boston, Massachusetts, signed an application for insurance addressed to the Mutual Benefit Life Insurance Company of Newark, New Jersey. In his application Green recited that he was 23 years of age and was then employed as a time study engineer at the plant of Pratt & Whitney Aircraft Company, East Hartford, Connecticut. There were a number of printed questions on the application form designed to elicit information as to the applicant's past experience with aviation and his expectations as to future participation in aerial flight. Green stated that he had had ten flights, none of them as a fare-paying passenger over scheduled routes; that

he contemplated further flights within the ensuing year; that he did not then have a student's or pilot's license, but contemplated taking the regular training course in flying offered by the Civil Aeronautics Administration. The applicant also stated that he did not contemplate "within the next year engaging in army or naval service, or changing my residence or occupation, or traveling outside of the United States or Canada."

The defendant's life insurance policy in the sum of $5,000 was delivered to Green at Boston, Massachusetts, on March 20, 1941, at which time and place the first premium was paid to the defendant's authorized agent.

The policy contained the following provision, upon which the present case turns: "Aviation Clause—Death occurring by reason of any aerial flight or journey is not a risk assumed by the Company, except to the extent of the entire reserve, less any indebtedness, on this Policy or on any Extended Insurance hereunder. If the Insured at the time of such flight shall be a fare-paying passenger in course of transportation from one definite terminal to another by means of an aerial conveyance in charge of a licensed pilot, this provision shall not be effective."

Summarizing the stipulation, the following facts appear: On March 28, 1942, Green enlisted in the United States Naval Reserve as a seaman second class. Thereafter on August 1, 1942, he was appointed an aviation cadet in the Naval Reserve and assigned for training to the Naval Air Station, Glenview, Illinois. At this training unit he was the pilot of a SBD type airplane, otherwise known as a Navy Scout Bomber. On April 13, 1943, the day of Green's death, acting under orders and in line of duty, he was engaged with four other planes of the same type in carrier landing aboard the U.S.S. Wolverine. While he was in the air, flying solo, "a sudden and unpredicted very heavy driving snowstorm hit the area * * *, and reduced the ceiling and visibility to zero almost without notice." The insured's plane lost sight contact with the mother ship. At 10:53 A. M. Green reported by radio "that he was experiencing carburetor icing and was losing power, and at 11:10 A. M. he reported that he was making a forced landing in the water." The mother ship immediately organized an extensive search and directed the Coast Guard to despatch all available boats to the spot from which Green's airplane was last heard. At 1:55 P. M. an oil slick was sighted in the water, and at 2:05 P. M. a semi-inflated life raft was seen. Shortly afterwards Green's body was discovered in the water and recovered by one of the boats sent out by the U.S.S. Wolverine. Green was dead when his body was taken into the boat. His life jacket was partially inflated. "The report of the medical examiner is that death occurred from drowning and exposure. Because of the low air and water temperature it was not believed that a man could retain consciousness longer than twenty to twenty-five minutes." Green's body disclosed no signs of a hard blow. "If competent and material, a Navy expert would testify from the foregoing facts that the plaintiff's testate made a controlled forced landing and became separated from his life raft before he could inflate it and secure it to his person."

■ On these facts we think the District Court was clearly right in ruling that the aviation clause was applicable and disentitled the plaintiff to recover beyond the amount of the reserve. In his memorandum the District Judge stated: "The parties have assumed that they are governed by the law of Massachusetts where the insurance contract became effective by delivery." Nothing turns on this, because it is not suggested that the Massachusetts law contains any principles or rules of decision different from those generally held to be applicable in the interpretation of an insurance contract of this nature.

■■ We do not doubt appellant's proposition that the courts must look to the entire policy, including the application which is made a part of it, "for a true understanding of, what risks were assumed by the company and what risks were meant and understood to be excluded when the company wrote and the insured accepted the contract." And it is superfluous to cite authority for the familiar rule that any ambiguities in the language of the policy are to be resolved against the insurer.

■ But we can discover no ambiguity in the aviation clause, either patent or latent. Appellant stresses the fact that the company chose not to insert a military risk exclusion clause. It is contended that the risks of civil aviation and the risks contingent upon military service are two entirely separate and distinct things; and that

in view of Green's disclosure in the application that he had in mind only participation in civil aviation and did not contemplate engaging in army or naval service, the aviation clause should be read as intended merely to exclude from coverage the risks attendant upon civil aeronautics training and flight, and not the distinctive risks of military service.

The difficulty with this argument is that these two types of risk, which appellant says are distinctive, are to some extent overlapping. Since Green was not, at the date of his application, in military service and did not then contemplate engaging in such service within the ensuing year, the company decided not to include a military risk exclusion clause. Such a clause would have excluded from coverage not only the risks of death from participation in military aviation but also the other multifarious risks attendant upon military service, whether such service were in the air, or on the ground or under the sea. But Green's application disclosed that he contemplated training as an airplane pilot, not merely an occasional flight as a fare-paying passenger. On the basis of this information, it was for the company to say how far it was willing to undertake the risks of aerial flight. The aviation clause excludes generally "death occurring by reason of any aerial flight" and it certainly cannot be gainsaid that Green was engaged in an aerial flight on April 13, 1943, the day of his death. The clause then introduces one qualification, namely, that it is not to be applicable in the single situation where the insured is a fare-paying passenger in course of transportation from one definite terminal to another by means of an aerial conveyance in charge of a licensed pilot. Appellant would also have us read into the clause another qualification to the effect that it shall be inapplicable where the insured is flying a plane under orders in military or naval service. Such a reading would go beyond the scope of permissible interpretation. As appellee rightly says, the company is interested in the risk itself, and is not concerned with the reason for the exposure.

■ In this connection appellant suggests that the inclusion in the policy of the standard statutory incontestable clause tends to contribute some ambiguity to the aviation clause. Clearly the incontestable clause has no bearing on the present case. Head v. New York Life Insurance Co., 10 Cir., 1930, 43 F.2d 517, 519.

■ Finally appellant makes the contention that, even conceding that Green was engaged in an "aerial flight" within the meaning of the aviation clause, the District Court was in error in concluding on the stipulated facts, as a matter of law, that the death must be regarded as having occurred "by reason of" such aerial flight. We do not agree. In view of the stipulated facts, there remained no debatable issue of proximate cause appropriate for jury determination. Neel v. Mutual Life Insurance Co. of N.Y., 2 Cir., 1942, 131 F.2d 159, is squarely in point on this phase of the case. There the policy contained a double indemnity clause which, however, provided that double indemnity shall not be payable "if death resulted * * * from participation in aeronautics." The insured took off in a two-seater plane, flying solo, and never returned to the airport. Over two weeks later his body was found floating, face down, nine miles out in the Atlantic Ocean. There was evidence from which it could have been found that the insured made a forced landing on the water without bodily injury and died from drowning while trying to swim to shore. The court held that as a matter of law the insurer was not liable for the double indemnity. It was immaterial, the court said, that the insured might not have been killed by the impact with the water. "If he landed in the open sea, even though without immediate injury, drowning was an almost inevitable consequence." (page 160 of 131 F.2d) Again, the court said, "Here, as a matter of common knowledge, and in view of the natural meaning of the words used, liability is excluded by the terms of the policy when an accident is incident to an ordinary risk of aviation." (page 161 of 131 F.2d) See also Wendorff v. Missouri State Life Insurance Co., 1927, 318 Mo. 363, 1 S.W.2d 99, 57 A.L.R. 615.

The natural and obvious meaning of the aviation clause in the case at bar is that the insurer declines to assume those extra risks of death ordinarily associated with aerial flight. Where death admittedly results from the operation of one of those familiar and popularly understood risks there cannot be any issue of proximate causation for a jury to determine. Drowning after a forced landing in icy waters during a "very heavy driving snowstorm" with ceiling and visibility zero is indisputably a familiar risk ordinarily associated with aerial flight. Appellant argues that a jury would have been warranted in finding that "the insured

at least temporarily reached a potential place of safety uninjured and his death thereafter occurred by reason of other, fortuitous circumstances." But such a finding would be utterly at variance with the stipulated facts.

It is true that the plaintiff reserved the right "to introduce further evidence cumulative and in accordance with the facts set forth in this stipulation." Possibly this reservation would have been broad enough to permit the plaintiff to introduce evidence not inconsistent with the facts stipulated. It is suggested that the plaintiff might have been able to show by such further evidence "that the proximate cause of the insured's death was either defective life-saving equipment (jacket or raft) or negligence on the part of those who were responsible for rescue operations." But even if it were shown that Green's life might have been saved had such equipment been in good order, or had the rescue operations been more efficiently conducted, this would not have altered the case. The mere fact that proper protective or rescue measures might have succeeded in surmounting the risk does not obscure the conclusion that what did happen was death by the operation of a risk ordinarily associated with aerial flight. Cf. Atkinson v. Goodrich Transportation Co., 1884, 60 Wis. 141, 167, 18 N.W. 764, 776, 50 Am.Rep. 352; Am.L.Inst.Restatement of Torts, § 452.

Appellant's main reliance, on the causation point, is the recent case of Bull v. Sun Life Assurance Co., 7 Cir., 1944, 141 F.2d 456. This case, whether correctly decided or not, is clearly distinguishable. The policy contained a clause stating that death as a result, directly or indirectly, of service, travel or flight in any species of aircraft, as a passenger or otherwise, is a risk not assumed. There was no clause excluding war risks. The insured was a pilot of a seaplane engaged in routine patrol duty in the South Pacific. The plane was peppered by Japanese anti-aircraft fire and was forced to make a landing on the water 500-1000 yards offshore. There was evidence warranting a finding that while the insured was out upon the fuselage trying to inflate a rubber boat he was shot by machine gun fire from a Japanese plane and died from the bullet wounds. The court upheld a verdict and judgment for the plaintiff. We are not inclined to disagree with this case. It may reasonably be said that death by the deliberate act of a third person is not one of the risks ordinarily associated with

aerial flight. Travel in a plane brought the insured to the place where he met his death by enemy action, but he might just as well have been brought to that place by a boat or otherwise. Surely, if the plane had made a safe landing on the island, and the insured had been killed by a Japanese sniper upon alighting from the plane, "a common-sense appraisement of every day forms of speech and modes of thought" would not lead us to say that death resulted from the aerial flight within the fair meaning of the aviation clause. The situation presented in the Bull case was no different in principle.

The judgment of the District Court is affirmed, with costs to the appellee.