Esther W. McDANIEL, Plaintiff-Appellee,

v.

STANDARD ACCIDENT INSURANCE COMPANY, Defendant-Appellant.

No. 11232.

United States Court of Appeals, Seventh Circuit.

March 31, 1955.

Rehearing Denied April 20, 1955.

Duffy, Chief Judge, dissented in part.

Charles D. Snewind, John J. Maciejewski, Chicago, Ill., for appellant.

George J. Miller, Chicago, Ill., David J. Ratner, Chicago, Ill., Ratner, Miller & Levenson, Chicago, Ill., of counsel, for appellee.

Before DUFFY, Chief Judge, and FINNEGAN and SCHNACKENBERG, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

This action was brought by Esther W. McDaniel, widow of Hollis McDaniel, deceased, against the defendant on its accident policy in which decedent was the insured.

The policy in question insured Hollis McDaniel "from loss resulting directly and independently of all other causes from accidental bodily injuries" with the limitation that no benefits are payable:

"For death, disability or other loss resulting directly or indirectly from injury sustained by the Insured while in or on any aircraft or other device for air travel or in falling or otherwise descending therefrom or therewith or while operating or handling such aircraft or device, unless the Insured is riding as

a fare-paying passenger in a licensed airplane or dirigible, operated by a licensed passenger carrier on a published schedule over a regular passenger route and between established airports."

At 8 a. m. on June 9, 1952, McDaniel, a Chicago dentist, and Ward, a Chicago retailer, took off from Sand Airport on the shores of Portage Lake at Houghton, Michigan, in McDaniel's private plane. It was a clear, sunshiny day, the temperature was about 70°, and "visibility was unlimited." The plane cleared the airport and was over Portage Lake when it was struck by "some heavy turbulence." The wind whipped the plane around approximately 180° and sent it into a "down-wind leg." The plane was under control but was unable to "get any lift" and constantly lost altitude.

Ward headed the ship for a dock on the shore of the lake and set the plane down approximately 30 or 35 yards from shore. The shock of landing was not hard.

As the plane landed in the water, McDaniel was seated to the right of the pilot. He released his seat belt and opened the door of the plane and got out. Ward also climbed out of the ship and saw McDaniel hanging on a wing of the plane. He observed that there was nothing wrong with McDaniel at that time. He did not see any scratches, lacerations or bruises on McDaniel and concluded that McDaniel was uninjured when the plane landed in the water. He observed also that McDaniel did not receive any injury while descending from the airplane. After Ward got out of the plane, he swam to the tail to balance it. After about 20 to 30 seconds both men started to swim toward the shore. Both were fully clothed and neither had any time to take off their clothing. The plane sank about a minute and a half after landing in the water.

As they started to swim toward the shore, McDaniel was about 20 feet to the right of Ward. The water in the lake at this point was clear, deep, still and cold. There were no waves, down-suction, eddies or turbulences in the water. Ward observed that McDaniel was swimming all right. Not more than 2 or 3 minutes elapsed between the time the plane struck the water until Ward got to the shore and was pulled up the 10 foot embankment by men on the shore. He testified that as he was being pulled up he saw McDaniel "about 15 feet from shore * * * and he had just stopped swimming then, and that is the last I saw him; he went down under the water." The depth of the water there was about 35 feet. The evidence further showed that McDaniel was an average good swimmer, and on occasions swam for an hour and a half at a time in a lake close to Portage Lake.

1. Defendant contends that drowning, after a forced landing of a land-based plane in cold water, is an undisputable risk associated with aerial flight in a private plane and further that it was a risk intended to be excluded from the operation of this policy. If this argument is logical it would mean also that if a person were forced to land his private plane in a pasture, where, after safely alighting, he was gored to death by a vicious bull, an insurer would not be liable on a policy containing the clause now under consideration. Likewise, such a landing made in a public highway followed by the accidental death of the insured after alighting from his plane and resulting from being struck by a passing automobile, would be similarly excluded from such a policy.

There is no evidence in this record that the death of the insured resulted directly or indirectly from injuries sustained by him while in the airplane or in falling or descending therefrom or therewith. Furthermore, there is no evidence from which such an inference can be reasonably drawn. After leaving the plane he swam a considerable distance in cold water and drowned. The exclusion clause of the policy does not apply to this case.

2. Inasmuch as these simple conclusions are supported by uncontradicted evidence, and in fact the defendant introduced no evidence at the trial, we cannot say that the District Court erred in finding that defendant's refusal to pay the amount due under the policy was unreasonable and vexatious. Accordingly the judgment against the defendant for $5,000 with interest amounting to $395.83 and attorney's fees in the sum of $500 to be taxed as costs, is affirmed.

DUFFY, Chief Judge (dissenting in part).

I agree that the plaintiff should recover upon the policy. However, I disapprove the allowance of $500.00 attorney's fees.

The Illinois statute authorizes the recovery of attorney's fees as part of the taxable costs, where an insurance company's refusal to pay the loss is "vexatious and without reasonable cause." This action was not a one-sided lawsuit. An insurance company should not be compelled to defend on its policy at the peril of being assessed attorney's fees as costs, if it should lose. I think this was a case where the insurance company was entitled to its day in Court, and that in so doing, it did not act in a vexatious manner without reasonable cause.