John S. ELLIOTT and Fredda Caldwell Elliott, Plaintiffs,

v.

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, a corporation, Defendant.

Civ. A. No. 66–478.

United States District Court
N. D. Alabama, S. D.

Feb. 10, 1967.

William G. West, Jr., and the firm of Sirote, Permutt, Friend & Friedman, Birmingham, Ala., for plaintiffs.

Ralph B. Tate and the firm of Spain, Gillon, Riley, Tate & Ansley, Birmingham, Ala., for defendant.

## OPINION ON MOTIONS FOR SUMMARY JUDGMENT

GROOMS, District Judge.

Each of the parties herein has filed a motion for summary judgment. Plaintiffs' motion has been once and the defendant's motion twice amended. The motions are accompanied by affidavits, and documents which are stipulated as to authenticity.

Plaintiffs are beneficiaries of a life insurance policy issued by the defendant upon the life of Donald G. Elliott in the principal sum of $15,000.00, with double indemnity in the event of accidental death. They sue for both the single and double indemnity benefits.

Defendant in defense sets up the aviation exclusion provisions of the policy and has tendered into Court $849.20, the premiums paid with interest thereon, the alleged limits of its liability based upon the applicability of these provisions.

The policy provides that the insurer does not assume the risk of:

"Death resulting from travel or flight in, or descent from or with, any kind of aircraft aboard which the insured is a pilot or member of the crew * * or has any duty incident to the operation of said aircraft."

The exclusion under the double indemnity provision is as follows:

"The benefits under this provision shall not be payable if the death of the insured shall have resulted directly or indirectly from * * * (4) travel, or flight in, or descent from or with, any kind of aircraft aboard which the insured is a pilot or member of the crew * * * or has any duty incident to the operation of said aircraft."

The Summary of Facts prepared by the military authorities after the investigation which followed the insured's death presents substantially everything that is known or inferred from that event. The insured was a captain in the 159th Fighter Interceptor Squadron, Florida Air National Guard, based at Imeson Airport, Jacksonville, Florida. His death occurred off the Florida coast between St. Augustine and Daytona Beach. The report continues:

"At about 1330 EST,. 11 October 1965, Captain Elliott took off from Imeson Airport alone in F-102A aircraft, SN 56–1358, for an authorized routine training flight. Weather was good. He was instructed to climb to 25,000 feet, proceed southeast for 50 nautical miles, turn north until he was 50 nautical miles north of the field, at which point he was to call Jacksonville Approach Control on the aircraft radio and practice VFR approaches at Imeson Airport.

"At about 1356 the following radio transmissions were received in, and sent by, Imeson control tower:

'Mayday, Mayday, Mayday—Echo Hotel-76.' (EH-76 was the identification call sign of Captain Elliott's aircraft.)

Tower: 'EH-76, Jax tower, go ahead.

EH-76: 'I'm in a spin going through fifteen thousand uncontrollable.

Tower: 'Understand in a spin passing fifteen thousand uncontrollable. What is your present position, please?

EH-76: 'Presently, fifty miles on 150 degree radial.

Tower: 'Fifty miles, 150 degree radial.

EH-76: 'Roger, I'm punching out.'

"This conversation took about 43 seconds and ended at 1356:33 EST.

"Jacksonville Center immediately notified the appropriate rescue authority of the fact that Captain Elliott was bailing out of his aircraft and the approximate location. The Naval Air Station, Jacksonville, launched a standby helicopter and requested a helicopter launch from the naval station at Mayport and the naval station at Cecil Field.

"At 1407 EST the rescue helicopter from Mayport was airborne. The other two helicopters took off shortly thereafter but were not involved in the rescue attempt. The helicopter from Mayport, manned by four Naval Rescue personnel, reached the downed pilot at about 1435 EST. The F-102A aircraft was not seen.

"The helicopter crew observed that the pilot's head was one foot or more underneath the surface of the water. Navy rescue man Norman W. Chatman, HM 1 (SS) AC, USN, Mayport Naval Station, was instructed by the helicopter pilot, F. E. Lewis, ATC/AP, USN, Mayport Naval Station, to jump in the ocean to assist the pilot. Chatman immediately jumped from the helicopter, swam to the pilot and attempted to lift him into the pilot's life raft which was floating near the pilot. The weight of the pilot's parachute and gear prevented this action. The helicopter was brought overhead and a hoist hook was dropped to Chatman. Using the hoist hook the pilot was lifted out of the water and up to the helicopter. Lines holding the pilot's gear were cut and he was brought into the helicopter.

"Artificial respiration was attempted, but after about 20 minutes it was stopped because it was apparent that the pilot was dead. The helicopter crew delivered the pilot's body to the Naval Air Station, Jacksonville, Hospital.

"During the removal of Captain Elliott from the sea, Chatman was assisted by two other Naval Rescue men in the helicopter, Joyce E. Cummings, ANS 3, USN, and James E. Davis, ADR-3, USN, Mayport Naval Station.

"An autopsy was performed on Captain Elliott and it was determined that the sole cause of death was drowning.

"The wreckage of the aircraft was recovered 17 days later about 50 miles southeast of Imeson Field in about 50 feet of water. Examination of the wreckage by expert personnel did not reveal any evidence of materiel failure.

"The pilot's ejection seat, parachute, and life raft were recovered shortly after the pilot was picked up. A thorough analysis was made of the survival gear and the other evidence, by a Board of well-qualified investigators, who determined that the following occurred:

"Captain Elliott ejected from the aircraft at about 3,000 feet. His parachute opened. He inflated his 'Mae West' life preserver. His one-man life raft inflated properly and dropped beneath him on its lanyard as he descended toward the water. Captain Elliott was not injured during the ejection from the aircraft and he was not injured when he entered the water. At sometime, either during the descent or after entry into the water, he became entangled with the shroud lines of his parachute. He used his pilot's knife to cut several of the shroud lines. He removed his right boot and his gloves.

"In the water, some of the shroud lines were entangled on his right leg and ankle. In reaching down to clear his ankle he caused his life preserver to move from its normal position on his chest and under his chin to a position under his armpits. In this position it was extremely difficult for him to raise his head above the surface. When the Naval Rescue man jumped in beside him, Captain Elliott was drowned, with his head beneath the water, his feet down, and his arms outstretched. His life preserver was

working properly, except for being out of its proper position on his body.

"There were no other witnesses at the scene."

The affidavits submitted by the plaintiffs established the fact that the insured was a strong and excellent swimmer, and since childhood had been able to swim "great lengths;" that during the six and one-half years he served in the United States Air Force he took various survival courses, including a sea survival course of approximately two weeks' duration off the south coast of Japan. The actual water temperature at the time and place where the insured lost his life is not known. The affiants assert upon information and belief it was not frigid, but moderate.[1]

There are no Alabama cases dealing with the main question at issue.

The defendant rests its case upon Pittman v. Lamar Life Ins. Co., 5 Cir., 17 F.2d 370; Neel v. Mutual Life Ins. Co. of New York, 2 Cir., 131 F.2d 159; Green v. Mutual Ben. Life Ins. Co., 1 Cir., 144 F.2d 55; Order of United Commercial Travelers of America v. King, 4 Cir., 161 F.2d 108; Willingham v. Life & Cas. Ins. Co. of Tenn., 5 Cir., 216 F.2d 226, 47 A.L.R.2d 1017; Hobbs v. Franklin Life Insurance Company, 5 Cir., 253 F.2d 591; and Rauch v. Underwriters at Lloyd's of London, 9 Cir., 320 F.2d 525. It places special reliance upon Willingham and Hobbs.

Plaintiffs' chief support is found in Bull v. Sun Life Assur. Co. of Canada, 7 Cir., 141 F.2d 456; Massachusetts Mut. Life Ins. Co. v. Smith, 5 Cir., 193 F.2d 511; McDaniel v. Standard Accident Insurance Company, 7 Cir., 221 F.2d 171; and Eschweiler v. General Accident Fire & Life Assurance Corp., 7 Cir., 241 F.2d 101.

In Bull, with Judge Major dissenting, the court held that the beneficiary was entitled to recover where the insured was strafed by a Japanese Zero while standing on a wing of his disabled plane after the plane had suffered serious damages from anti-aircraft fire and had alighted. The court concluded that Bull's death resulted from a war risk rather than an aviation risk.

In Smith, after the court had first ruled in favor of the insurer, on application reversed with Judge Strum dissenting. Colonel Smith left Puerto Rico in a C–47 on an over-water flight and was never seen after it entered a storm front in the open sea flying at 1100 feet. The court made the following statement on application for rehearing:

"The burden of proof was on the insurer to prove that death resulted from an aviation hazard. If the plane was shot down by enemy submarines, the appellee is entitled to recover; the same is true if the plane fell, sank, was never heard of, and Colonel Smith made his way to one of the near-by uninhabited islands, where he died of disease or starvation, as Jennings came very near doing."

Based on the first assumption the court arguendo was apparently pointing to Bull—death from enemy action. On the second assumption it appears to draw a line which would place this case under the facts here involved within the aviation exclusion.

In regard to Smith it may be noted that the beneficiary of another passenger, who was on the plane with Colonel Smith, did not recover in the face of an aviation exclusion provision. See Barringer v. Prudential Ins. Co. of America, 62 F. Supp. 286, aff'd 3 Cir., 153 F.2d 224. There the trial was without a jury. The court found that the beneficiary was not entitled to recover "as a matter of law."

In McDaniel, supra, the insured drowned while swimming to shore from a plane that had alighted near the shore of Lake Portage, Michigan. There the exclusion provision provided that no benefits were payable for death resulting

---

1. An affidavit on a motion for summary judgment must be based on the personal knowledge of the affiant. Mercantile National Bank at Dallas v. Franklin Life Ins. Co., 5 Cir., 248 F.2d 57.

directly or indirectly "from *injury* sustained by the Insured while in or on any aircraft * * * or in falling or otherwise descending therefrom * * *" (Emphasis supplied). The court held that there was no evidence that the insured's death resulted directly or indirectly from *injuries sustained* while in the airplane or in falling or descending therefrom or therewith. The evidence established that he was not *injured* when he left the plane.

Although the exclusionary clause in *McDaniel* was more limited and restrictive than in *Eschweiler,* supra, the clause in the latter limited its exclusion to *injuries,* fatal or non-fatal, sustained under like provisions to those in *McDaniel* above quoted. The insured in *Eschweiler* died from cardiac failure upon reaching the shore after landing his plane on the partially frozen surface of Lake Wisconsin.

A fact of significance, though not necessarily controlling, is that at sometime, either during descent or after entry into the water, the insured "became entangled with the shroud lines of his parachute." This was an important link in an unbroken, uninterrupted chain of events that led directly to the insured's death. The insured was piloting a land-based plane; the plane went into a spin and became uncontrollable; he bailed out using a parachute; in the descent into the Atlantic Ocean or after entry into the water he became entangled in his parachute; he tried to free himself; in so doing he caused his life preserver to move under his armpits and was drowned.

The Court is of the opinion that under the undisputed facts here shown and the reasonable inferences deduced therefrom that the authorities cited by the defendant, and particularly *Hobbs* and *Willingham,* supra, sustain defendant's position. The authorities cited by the plaintiffs are distinguishable, represent a minority view, and do not conform to the law as declared by the Court of Appeals for the Fifth Circuit.

This conclusion is not rendered inapplicable to the single indemnity exclusion by virtue of the fact that the double indemnity exclusion excludes death resulting "directly or indirectly" from travel or flight in an aircraft, while the single indemnity exclusion excludes death resulting from travel or flight in an aircraft, omitting the words "directly or indirectly."

An analogous situation was presented in *Willingham,* where the insured was thrown or jumped from the plane in which he was a passenger and was killed when he struck the ground. The beneficiary contended that since the double indemnity exclusion excluded, among other causes of death, death resulting while the insured was "descending from" any kind of aircraft, and since those words were omitted from the single indemnity exclusion, a recovery for the single indemnity should be permitted in view of the fact that the insured lost his life while descending from the aircraft. The court held that such construction was impermissible since the words "riding in" employed in the exclusions would include descent from the plane.

In *King,* supra, where the insured uninjured in landing had drowned as a result of exposure in the water after the failure of his airplane motor, the policy excluded "death resulting from participation, as a passenger or otherwise, in aviation or aeronautics." The court stated, following the contention that death resulted from drowning and not from participation in aviation, that:

> "Out of the abundance of wisdom that comes with hind-sight it might have been better to have also inserted the words 'directly or indirectly' in the exclusion clause. Actually such words were not vital here and would have added little to the force of the word 'resulting.'"

Defendant's motion for summary judgment will be granted, except as to the sum of $849.20 paid into the Registry of the Court and representing the premiums

paid by the insured with interest, and will be denied as to said sum.

Plaintiffs' motion will be denied, except as to said sum of $849.20, and will be granted as to said sum.