**RISS & COMPANY, Inc., Plaintiff,**

v.

**ASSOCIATION OF AMERICAN RAILROADS et al., Defendants.**

Civ. A. No. 4056–54.

United States District Court
District of Columbia.

Dec. 9, 1960.

Counsel for plaintiff

Riss & Company, Inc.; A. Alvis Layne, Robert L. Wright, Lester M. Bridgeman, Morton A. Brody, Washington, D. C.

Counsel for defendants

1. Association of American Railroads; William E. Miller, Stephen Ailes, Richard A. Whiting, Gregory S. Prince, Philip F. Welsh, Washington, D. C.

2. Association of Western Railways; Stuart S. Ball, Richard J. Flynn, J. H. Hays, Amos M. Mathews, J. W. Nisbet, Chicago, Ill., Lawrence Cake, John Guandolo, Washington, D. C.

3. Traffic Executive Association Eastern Railroads; Samuel E. Gates, New York City, Chisman Hanes, James L. Kaler, Washington, D. C.

4. Eastern Railroad Presidents Conference; C. Brewster Rhoads, Joseph W. Swain, Jr., Philadelphia, Pa.

5. Carl Byoir & Associates, Inc.; Francis C. Reed, Powell Pierpoint, New York City, Robert M. Gray, Washington, D. C.

7. Atlantic Coast Line Railroad Company; Francis M. Shea, New York City, Prime F. Osborn, Louisville, Ky.

* 8. Atchison, Topeka & Santa Fe Railway Company; Stuart S. Ball, J. H. Hays, Amos M. Mathews, J. W. Nisbet, Chicago, Ill.

11. Baltimore and Ohio Railroad Company; Hugh B. Cox, James H. McGlothlin, James C. McKay, Washington, D. C., Edwin H. Burgess, John L. Rogers, Jr., Baltimore, Md.

15. Chesapeake and Ohio Railway Company; Edward K. Wheeler, Robert G. Seaks, Washington, D. C.

* 16. Chicago, Burlington & Quincy Railroad Company, * 21. Chicago, Milwaukee, St. Paul & Pacific Railroad Company, * 22. Chicago and Northwestern Railway Company, * 23. Chicago, Rock Island & Pacific Railroad Company; Stuart S. Ball, J. H. Hays, Amos M. Mathews, J. W. Nisbet, Chicago, Ill.

29. Erie Railroad Company; Hugh B. Cox, James H. McGlothlin, James C. McKay, W. T. Pierson, Washington, D. C., P. H. Donovan, Cleveland, Ohio.

31. Great Northern Railway Company; Stuart S. Ball, J. H. Hays, Amos M. Mathews, J. W. Nisbet, Chicago, Ill.

* 33. Illinois Central Railroad Company, * 40. Missouri-Kansas-Texas Railroad Company, * 41. Missouri Pacific Railroad Company; Stuart S. Ball, J. H. Hays, Amos M. Mathews, J. W. Nisbet, Chicago, Ill.

58. New York Central Railroad Company; Edward K. Wheeler, Robert G. Seaks, Washington, D. C., Gerald E. Dwyer, New York City.

65. Northern Pacific Railway Company; Stuart S. Ball, J. H. Hays, Amos M. Mathews, J. W. Nisbet, Chicago, Ill.

* 66. Pennsylvania Railroad Company; Hugh B. Cox, James H. McGlothlin, James C. McKay, Washington, D. C., John B. Prizer, Carl Helmetag, Jr., Lewin W. Wickes, Philadelphia, Pa.

* 70. St. Louis-San Francisco Railway Company, * 72. Southern Pacific Company, * 76. Union Pacific Railroad Company, *78. Wabash Railroad Company, 80. Minneapolis, St. Paul & Sault Ste. Marie Railroad Company; Stuart S. Ball, J. H. Hays, Amos M. Mathews, J. W. Nisbet, Chicago, Ill.

81. Southern Railway Company; Francis M. Shea, New York City, Henry L. Walker, Washington, D. C.

88. Seaboard Air Line Railroad Company; Francis M. Shea, New York City, Harold J. Gallagher, New York City, Charles T. Abeles, Richmond, Va.

SIRICA, District Judge.

On February 17, 1958 defendant (66), the Pennsylvania Railroad Company, filed a counterclaim in this action which reads as follows:

"Commencing prior to January 1, 1954 and at all times since that date Riss has unlawfully combined and conspired with other motor carriers (a) to injure and destroy the competition of this defendant and other rail carriers in the transportation of property in interstate commerce for the United States, (b) to monopolize such transportation and (c) to fix prices for such transportation. In furtherance of this combination and conspiracy Riss and other motor carriers have acted jointly to establish uniform rates over competing routes for the transportation of

* These defendants have filed counterclaims against the plaintiff.

property in interstate commerce for the United States, and particularly for the transportation of ammunition and explosives, at unreasonably low levels. Riss participated in such joint action for the establishment of uniform rates for the *purpose* of diverting *to itself and other motor carriers all such transportation* for the United States." (Emphasis added.)

On February 18, 1958 defendant (72), Southern Pacific Company, filed a similar counterclaim in paragraphs 9 and 10 of its counterclaims, as did defendants (8), The Atchison, Topeka & Santa Fe Railway Company; (16), Chicago, Burlington & Quincy Railroad Company; (21), Chicago, Milwaukee, St. Paul & Pacific Railroad Company; (22), Chicago and Northwestern Railway Company; (23), Chicago, Rock Island and Pacific Railroad Company; (33), Illinois Central Railroad Company; (40), Missouri-Kansas-Texas Railroad Company; (41), Missouri Pacific Railroad Company; (70), St. Louis-San Francisco Railway Company; (76), Union Pacific Railroad Company; and (78), Wabash Railroad Company, in Count II of their counterclaims. On August 25, 1960, by order of the Court, the first so-called "pretrial" conference on these counterclaims was called for September 17, 1960. This order directed each counterclaimant:

"[To] be prepared to state * * the specific evidence by which it proposes to show (a) the plaintiff's intent to exclude the counterclaimant from competing for government explosives traffic, (b) the conspiratorial conduct intended to accomplish such an injury and (c) the actual impact of this conduct upon the counterclaimant's ability to compete for such traffic."

This conference was held on September 17, and after considering all memoranda submitted by the parties, the proffered evidence of counterclaimants and the arguments, the Court, by Order of September 21, 1960, directed a separate trial of said counterclaims while retaining jurisdiction to consider any matters relating to the counterclaims which might be made a matter of record prior or subsequent to the conclusion of the trial of the case in chief. On September 23, 1960, plaintiff filed a motion for a summary judgment or a directed verdict which was briefed and argued on October 7, 1960. (On November 5, 1960, the jury returned a verdict for plaintiff against defendants (2), (3), (4), (5) and (66), in the case in chief.) This, then, is the history of and the present posture of these counterclaims, which are the only remaining counterclaims in this case.

At this pre-trial conference on the counterclaims, defendant-counterclaimants, while declining to formally amend their counterclaims, orally restricted their claim to that contained in subsection (c) of Count II, i. e.:

"Commencing prior to January 1, 1954 and at all times since that date Riss has unlawfully combined and conspired with other motor carriers * * * (c) to fix prices for [such] transportation. In furtherance of this combination and conspiracy Riss and other motor carriers have acted jointly to establish uniform rates over competing routes for the transportation of property in interstate commerce for the United States and particularly for the transportation of ammunition and explosives at unreasonably low levels. Riss participated in such joint action for the establishment of uniform rates *for the purpose of diverting to itself and other motor carriers all such transportation for the United States.*" (Emphasis added.)

Counsel disagree as to whether the above counterclaim as restricted states a price-fixing conspiracy with a monopolistic purpose *or* whether it states only a pure price-fixing conspiracy in violation of section 1. For reasons which will appear later in this opinion, the Court does not reach this question, or the question of the sufficiency of proof of liability under either theory.

It has, on occasion, been the practice of this and other Courts to require counsel to first offer proof on the question of liability so that if, in the opinion of the Court, no case of liability has been established, the question of the sufficiency of damage proof need not be reached. In this instance, the Court feels it advisable to reverse this procedure and examine, in the light of a motion for summary judgment, defendant-counterclaimants' proof of damages. In protracted antitrust cases it is not unusual for courts to refrain from passing on the evidentiary basis of a conspiracy charge when they have determined that insufficient evidence existed to support the damage claim. See: Wolfe v. National Lead Co., 9 Cir., 1955, 225 F.2d 427, 429; Delaware Valley Marine Supply Co. v. American Tobacco Co., D.C.E.D.Pa.1960, 184 F.Supp. 440.

For all practical purposes these counterclaims, insofar as the damage aspect is concerned, are at the same stage as if they had been actually tried. Counsel for counterclaimants have indicated that as far as their damage proof is concerned, they intend to rely on the record of the case in chief. On Saturday, September 17, the following discussion occurred between Court and counsel:

"The Court: As I understand that, that means to me that you are not going to show what all these other alleged co-conspirators did or transported; you are going to show what Riss did.

"Mr. McGlothlin: Yes, sir. (Transcript, p. 17,401.)

"The Court: Now let me ask you this question, and maybe you have an answer to it:

"Even though you are not going to show what all of these alleged conspirators haul or how much traffic they hauled, you have got this information which you are going to rely on, 37 to 37–C.

"Why should not the Court and the jury have the benefit, at least, of knowing exactly how much you hauled between the points set forth in 37 to 37–C by the plaintiff, the cost, the profits, et cetera?

"That would not be a Herculean job. I mean, they did it, and I don't know why the railroads couldn't do it.

"Mr. McGlothlin: Because it is immaterial.

"The Court: I think it might be material.

"How do we know that you didn't get a lot more tonnage than you indicate you would have gotten. How do we know that unless we have those figures?

"Mr. McGlothlin: You don't know it, but again it's immaterial. (Transcript, p. 17,405.)

\*      \*      \*      \*      \*      \*

"Mr. Flynn: \*  \*  \* Once we have established the fact of damages, that, I think, or I would almost be willing to rest on on the record that we have now as to the fact of the damage as the bulk of the proof on that subject is in the record. \*  \*  \*. (Transcript, pp. 17,448–449.)"

Counterclaimants' Memorandum in opposition to Plaintiff's Motion for Summary Judgment or a Directed Verdict states, in regard to the amount of injury: "The basic facts are now of record for purposes of this motion." (Memorandum, October 6, 1960, p. 13.)

Plaintiff's exhibits 37 to 37–C ("revised schedule 'B'") indicate the specific shipments, by quantity, rate, and origin and destination points, transported by Riss & Company during the alleged damage period, of ammunition and explosives for the United States Government. Defendant-counterclaimants revised memorandum setting forth the proffered materials dealing with the fact and amount of damages, a document of 236 pages, indicates that by using plaintiff's exhibits 37 to 37–C, counterclaimants have determined the rates applicable to Riss and other motor carriers with respect to points between which Riss transported

a substantial amount of government munitions traffic. Counterclaimants then set forth, for each of these specific points, the authority for such motor carrier rates and the competing routes over which such rates were applicable. Where a counterclaimant offiered to perform service between the same points as an originating or destination carrier, the counterclaimants have determined the portion that such counterclaimants would have obtained of the gross revenues which would have resulted had the railroads transported the tonnage carried by Riss according to plaintiff's exhibits 37 to 37–C, allegedly pursuant to the price-fixing conspiracy. (See appendix A of this opinion for an example of defendant-counterclaimants' method of proving the fact and amount of damage between two specific points.) Defendant-counterclaimants then determine their net profit from such diverted traffic by a costing procedure based on defendant the Chesapeake and Ohio Railroad's exhibits 29 to 39. (See appendix B of this opinion for an example of counterclaimants' method of determining net profit.)

The affidavit of Earnest C. Pierre, filed October 6, 1960, indicates that the evidentiary basis of defendant counterclaimants' proof of damages is a matter of record in this proceeding. That affidavit states:

"7. The information concerning the Riss movements of ammunition and explosives was obtained from plaintiff's exhibits 37, 37A, 37B and 37C. The information concerning Riss rates and routes was obtained from copies of Riss section 22 quotations and from motor carrier rate bureau quotations in which Riss participated. These documents were furnished by Riss from its files. The information concerning the rates and routes of other motor carriers was obtained from the motor carrier rate bureau quotations furnished by Riss and from the public files of the Military Traffic Management Agency. The rail rates were secured from the section 22 quotations set out in plaintiff's Exhibits 219B through 219K and from the rail tarriffs referred to therein. The rail routes were secured from the applicable tarriffs or quotations, and the rail divisions from the applicable division sheets or agreements."

Counterclaimants have filed a number of affidavits in connection with this matter, all of which are substantially identical in substance. These affidavits recite in summary that each counterclaimant, during the damage period, was ready, willing and able to transport the government munitions traffic in question, and had in effect rates which would have enabled the counterclaimants to transport such traffic over the points in question and that but for the rates quoted by motor carriers during the period, the counterclaimants would have transported "substantial additional" quantities of munitions from and to the points specified.

Basically then, defendant-counterclaimants' proof of damages is as follows: On certain identified routes Riss agreed with other motor carriers to charge the same rate at a particular period of time; that Riss did transport a specific amount of tonnage pursuant to such rate; that because of the general policy of the Defense Department, the counterclaimants would have received the specific individual shipments that Riss transported, but for the agreement between Riss and other motor carriers to quote the rate in question. There is ample testimony in this case concerning the routing policies of the military traffic agencies. At pages 11,770–73 of the transcript of trial, appears the following deposition testimony of Major General Paul F. Yount, who was Deputy Chief and Chief of Transportation for the United States Army, during part of the damage period.

"Q. Now, to the best of your recollection, what was the policy with respect to allocating and routing of military traffic between different

carriers? A. Basically, the controlling policy in all cases is economy of movement. (Transcript, p. 11,-770.)

"Q. * * * Let us suppose that you had a shipment to run between —a series of shipments between two specified points. There might be available two railroads and two trucklines to carry that transportation. How would that policy be applied in the allocation of the transportation assuming that their rates were exactly the same? A. If their rates and service were exactly the same, the railroads would have gotten essentially half the traffic. The division between those two railroads would be predicated upon their proportion of the rail capability in the area they serve. The truck lines would have also had a division of the traffic in relation to their capability * * * it is a little easier to administer and it is a little easier to describe with respect to the railroads * * * and that is kept on a carload basis in which they attempt to balance off over a period of quarters and a period of the year * * *."

"Q. The approximations would be rough, however, would they not? A. Of course, they are. In the administration of it, you can never be exact in the thing. It is merely, I think, in all good conscience, a honest attempt to obtain an equitable, *not an equal* division of traffic.

"Q. And the longer the period of time, the more equitable the distribution would be because of the ability to make the adjustments from time to time? A. That is correct. *You could never do it in a short time such as a month. You have to do it on a longer period.*

"Q. How would the division be made? A. The rail carrier would have had half of the business and the truck lines would have had the remaining half divided amongst them to their capabilities. Now,

there again, you must go back to the service, the question of the destination, the terms under which it originates, so that *there is no exact distribution or division of this traffic that you can claim.* It isn't an exact science by any means.

"Q. No, but the effort would be that over a period of, say, a year, under those circumstances, the divisions would be approximately 50 per cent between the railroad and 50 per cent between the trucking concerns? A. That was the general *attempt.* (Transcript, pp. 11,772–773)" (Emphasis added.)

Page 5338 of the transcript of trial indicates that the following deposition testimony of Colonel F. T. Edson, Chief of Army Freight Traffic Division during part of the damage period, was read into evidence:

"Q. Now, addressing yourself to the kind of traffic for which railroads compete with motor carriers, did you have any policy of dividing that traffic in any particular way? A. Let me think. I don't recall what policy we followed. There were many, many times though on big movements that we deliberately —rates and services being equal— split movements up between modes of transportation. If we had some tremendous big piecegoods movement or something like that, or movement between manufacturing or weaving plants and finishing plants, and that sort of business, lots of times we split that between modes of transportation.

"Q. Your remarks to this point have been addressed to all kinds of traffic I take it?

   *    *    *    *    *    *

"A. Yes.

   *    *    *    *    *    *

"A. You've got to consider all of the various elements in your whole transportation operation, service, cost, your requirement, the rate of flow that you have to have,

and the size of units that you must have going in to your production schedules. All those things have to be considered when you go to route that kind of traffic.

\* \* \* \* \* \*

"A. \* \* \* You would use the carrier that gave you—that would give you the nearest to what your customers say they need. \* \* \*

"Q. Did I understand you correctly to say that, in fact, where rail and motor carrier rates were equal you had divided traffic between them, but you didn't know of a policy that required you to do that? A. I don't recall any specific policy on that. (Deposition of Col. Edson, pp. 41–43.)"

Thus, it would appear that the policy of the military routing officers called for an "equitable" (not equal) division of traffic between the competing modes of transportation; such division to be made over an extended period of time and not on the basis of specific individual shipments. Further, even if costs were equal, the ability of a specific carrier to provide the kind of service needed for the individual shipment was in the last analysis the determining factor. Examining the above testimony in the light most favorable to defendant-counterclaimants, the most that can be said of the military routing policies is that over an extended period of time all things being equal, including costs and all manner of service considerations, the military did its best to "equitably" divide the traffic between competing modes of transportation.

■ The Court feels strongly that all facts which defendant-counterclaimants purpose to offer on their proof of the fact and amount of damage in regard to these counterclaims are already a matter of record in this case and that in view of its earlier remarks in this opinion on the procedure which has been followed in cases of this type, this matter is properly the subject of a Motion for a Summary Judgment. The Court will, therefore, examine the legal sufficiency of defendant-counterclaimants' proffered proof of damage in the light of the principles applicable to motions for summary judgment and the principles applicable to the sufficiency of damage proof in anti-trust suits.

■ In practice, the theory underlying summary judgment is the same as that underlying a motion for a directed verdict. In this circuit, summary judgment may be granted on evidence that would require direction of a verdict. Vale v. Bonnett, 1951, 89 U.S.App.D.C. 116, 118, 191 F.2d 334, 336; Dewey v. Clark, 1950, 86 U.S.App.D.C. 137, 143, 180 F.2d 766, 772. It has been said that this formula permits what amounts to the direction of a verdict without the necessity or technical formality of empaneling a jury. Holtzoff, Two Years Experience Under the Federal Rules of Civil Procedure, 21 B.U.L.Rev. 33, 35 (1941). Statements in affidavits as to opinion or belief are of no effect. Jameson v. Jameson, 1949, 85 U.S.App.D.C. 176, 178, 176 F.2d 58, 60. It is of course true that merely because a court surmises that the adverse party is unlikely to prevail at trial, it is not justified in authorizing summary judgment against it. However, genuine issues under the rule are issues which can be sustained by substantial evidence. The moving party has the burden of showing that at trial there will be no evidence competent or sufficient to support a finding for the opposite party.

■ Decisions of the Supreme Court in recent years have liberalized the proof of the fact and amount of damages in treble-damage suits. Bigelow v. RKO Radio Pictures, 1946, 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652; Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544. But there must still be a reasonable basis in the evidence from which the jury may draw a reasonable estimate of the amount of damages. The jury still cannot be allowed to speculate. Bigelow v. RKO Radio Pictures, supra.

■ Counterclaimants have not offered and do not propose to offer any

evidence of what each counterclaimant's volume of business was between any of the specified points during the relevant period. Counterclaimants have not offered and do not propose to offer any evidence of the relationship of the shipments transported by Riss to the total government explosives traffic of any counterclaimant between the relevant points. Counterclaimants have not offered and do not propose to offer any evidence on the various "service" considerations (e. g., the need for fast service on a particular shipment or the need for "door-to-door" service on a particular shipment) which military representatives have testified is often determinative as to which mode of transportation receives the business, costs being equal. The counterclaimants have not offered and do not propose to offer any evidence relating to the volume transported by competing *railroad* carriers between the specific points during the relevant period.

Thus it is evident to the Court that on the basis of the proffered evidence of counterclaimants relating to the fact and amount of damages, a jury could only speculate as to the impact of the alleged diversion of traffic upon the individual counterclaimants. They would not know how much traffic the counterclaimant actually received, how much its competitor railroads actually received, how many individual shipments would have gone to other carriers because of certain service disabilities of the counterclaimant in regard to a particular shipment. In other words, since the basis of the claim is that because of the defense department policy the individual counterclaimant would have received the specific shipments diverted by the allegedly unlawful rates of the motor carriers, the jury has no way of knowing whether the counterclaimant had *already* received its "equitable" share of the traffic or ten times its equitable share, and in no event even conceding the unlawful diversion, would have received any of the tonnage transported by Riss.

Further, there is no showing of the absence of any counterclaimant service disability on the shipments which would have allowed them to transport the traffic.

In antitrust cases, a party has the burden of furnishing the best available evidence that the subject matter permits, as to what the impact of the claimed illegal conduct was on its business. Rankin Co. v. Associated Bill Posters, 2 Cir., 1930, 42 F.2d 152, 155–156. Defendants cite Atchison, Topeka & Santa Fe Ry. Co. v. Aircoach Transport Ass'n, 1958, 102 U.S.App.D.C. 355, 253 F.2d 877, in support of their contention that they only need prove what traffic their unlawful rate-quoting competitor carried in order to recover damages. The Aircoach case contains no discussion of the quantum of damage proof required and, in fact, the Court in Aircoach was not presented with the question of proof of fact or amount of damage.

In Delaware Valley Marine Supply Co. v. American Tobacco Co., D.C.E.D.Pa. 1960, 184 F.Supp. 440, a case involving the claim that absent a concerted refusal to sell by defendants, the plaintiff would have been able to sell a certain quantity of "sea-store" cigarettes to a specified number of vessels, Judge Steel commented at length on the various assumptions which the plaintiff claimed arose from his damage proof and then stated:

"But despite judicial liberality in accepting minimal proof of damages in an anti-trust case, the rule persists that any damage estimate by a jury must be 'just and reasonable' and not based on 'speculation or guesswork.'" 184 F.Supp. at page 449.

Defendant-counterclaimants' proffered proof of the fact and amount of their damages from Riss & Co.'s alleged price-fixing conspiracy gives rise only to speculation.

The motion of plaintiff for summary judgment on the counterclaims of defendants (8), (16), (21), (22), (23), (33), (40), (41), (66), (70), (72), (76) and (78) is granted. Counsel for plaintiff will prepare an appropriate order.

Exhibit "A"

Excerpt from Revised Memorandum of Counterclaimants with
Respect to Count II of their Counterclaims, pp. 46, 47

Joliet Arsenal, Joliet, Illinois
to
Ravenna Arsenal, Atlas, Ohio

Shipments per Revised Schedule B.

| Date | | Quantity | Rate |
|------|------|----------|------|
| May 5, 6, 7 | 1954 | 357,500 | 122 |
| May 11, 12, 13 | 1954 | 357,500 | 122 |
| May 17, 18, 19 | 1954 | 357,500 | 122 |
| May 21 | 1954 | 165,000 | 122 |
| May 25 | 1954 | 275,500 | 122 |
| May 27 | 1954 | 137,500 | 122 |
| June 3, 4 | 1954 | 110,000 | 122 |
| June 9, 10 | 1954 | 385,000 | 122 |
| June 14 | 1954 | 165,000 | 122 |
| June 16, 17, 18 | 1954 | 247,500 | 122 |
| June 21, 22, 23 | 1954 | 165,000 | 122 |
| Aug. 19 | 1954 | 165,000 | 122 |
| Sept. 2 | 1954 | 82,500 | 122 |
| Sept. 7, 8, 9 | 1954 | 467,500 | 122 |
| Oct. 29 | 1954 | 165,000 | 122 |
| May 2, 3, 4, 5, 6 | 1955 | 468,500 | 122 |
| May 9, 10, 11, 12, 13 | 1955 | 440,500 | 122 |
| May 16, 17, 18, 19, 20 | 1955 | 412,500 | 122 |
| May 23, 24, 25, 26, 27 | 1955 | 412,500 | 122 |
| June 1, 2, 3 | 1955 | 273,580 | 122 |
| June 6, 7, 8, 9, 10 | 1955 | 496,490 | 122 |
| June 13, 14, 15, 16, 17 | 1955 | 468,500 | 122 |
| June 20, 21, 22, 23, 24 | 1955 | 414,960 | 122 |
| June 27, 28 | 1955 | 247,500 | 122 |
| June 30 | 1955 | 51,105 | 122 |

The Riss rate was established in Riss Section 22 quotation Nos.
498–54, AEF-1, and AEF-3-ECD via the following route:

(1) Riss & Co. to Akron, Ohio; M. & M. Trucking Co.
The identical rate was established in Hayes Freight
Lines Section 22 Quotation No. 844 via the following
competing route:

(2) Hayes Frt. Lines, to Cleveland, Ohio; Wells Truck
Lines.

The following counterclaimants participated in routes which
would have enabled them to perform the service, and offered to
perform such service at a through rate of $1.5065 per 100
pounds (AAR No. 14-A):

Atchison, Topeka & Santa Fe
Chicago, Milwaukee, St. Paul and Pacific
Wabash
Pennsylvania Railroad

Under the existing policies of the military establishment and the then applicable division agreements between rail carriers, each would have received the following revenues from the traffic transported by Riss:

| | |
|---|---:|
| Atchison, Topeka & Santa Fe | $ 6,862.71 |
| Chicago, Milwaukee, St. Paul and Pacific | 6,862.70 |
| Wabash | 6,862.70 |
| Pennsylvania Railroad | 27,450.82 |

———◆———

## Exhibit "B"

### Excerpt from Memorandum of Counterclaimants with Regard to Paragraph II, of the Court's Order of August 25, 1960, pp. 13, 16

1. Counterclaimants will establish that throughout the period in question the average weight of Government explosives loaded in rail cars was approximately 92,000 pounds. For each movement of ammunition and explosives, they will determine the nearest whole number of cars of that average weight necessary to transport the quantity of explosives moved. In making such computation, they will assume that where the result of their computation results in a fractional car, an additional car was used. This will have the effect of increasing their costs.

2. Counterclaimants will determine the miles each railroad transported ammunition and explosives between the point at which that railroad would receive it and the point at which it would deliver it or turn it over to another railroad.

3. Counterclaimants will determine the number of hundredweight in each movement of ammunition and explosives.

4. Using the number of cars, the number of car miles, the number of hundredweight, and the number of hundredweight miles for each movement, counterclaimants will apply the costs shown in the cost study, C & O Exhibits 29–39.

### C.

### Cost of Handling

#### Counterclaimant—Atchison, Topeka and Santa Fe Railway Company

#### Operating Units

| Movement — | From Joliet Arsenal, Illinois to Chicago, Illinois |
|---|---:|
| Distance (Miles) | 49 |
| Number Carloads o | 21 |
| Number of Hundred Weight | 18,221.58 |
| Number of Car Miles | 1,029 |
| Number of Hundred Weight Miles | 892,857 |

o. Originated.

### Estimated Cost of Handling

| Out of Pocket | Cents | Total |
|---|---|---|
| **Line Haul** | | |
| 1,029 Car Miles at | 22.09142 | $ 227.32 |
| 892,857 Cwt. Miles at | .01039 | 92.77 |
| **Terminal** | | |
| 21 Carloads o at | 6714.241 | 1,409.99 |
| 18,222 Cwt. at | 1.11145 | 202.53 |
| **Constant** | | |
| **Line Haul** | | |
| 892,857 Cwt. Miles at | .01735 | 154.91 |
| **Terminal** | | |
| 18,222 Cwt. at | 3.268 | 595.49 |
| Total Cost | | $2,683.01 |