John S. ELLIOTT and Fredda Caldwell Elliott, Appellants,

v.

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, Appellee.

No. 24658.

United States Court of Appeals Fifth Circuit.

Jan. 10, 1968.

William G. West, Jr., Birmingham, Ala., for appellants.

Ralph B. Tate, Birmingham, Ala., for appellee.

Before RIVES and GODBOLD, Circuit Judges, and HUGHES, District Judge.

RIVES, Circuit Judge:

Decision of this appeal turns on the application to stipulated facts of an "Aeronautical Risk Exclusion" in a policy of life insurance and a similar "Exception" in the policy's provision for indemnity benefit for death by accidental means. The insurance company denies liability for the face amount of the policy because of a provision which reads in pertinent part as follows:

"Limitation of Liability Provision.

"Aeronautical Risk Exclusion.

"The following risk is not assumed under the policy:

"Death resulting from travel or flight in, or descent from or with, any kind of aircraft aboard which the insured is a pilot or member of the crew * * * or has any duty incident to the operation of said aircraft."

As to the provision for death by accidental means, there are nine numbered "Exceptions," each of which may have some relevance, but the most pertinent part of which reads as follows:

"The benefits under this provision shall not be payable if the death of the insured shall have resulted directly or indirectly from: * * * (4) travel or flight in, or descent from or with, any kind of aircraft aboard which the insured is a pilot or member of the crew or is a student or instructor of aeronautics or is giving or receiving any kind of training or instruction or has any duty incident to the operation of said aircraft * * *."

Most of the material facts were without dispute. The policy of insurance on the life of Captain Donald G. Elliott was in force at the time of his death. His parents, the plaintiffs, appellants, were named as beneficiaries. Due notice of death was admitted. The parties agreed that the following "Summary of Facts" submitted by Colonel Robert A. Prince "represents the facts of the flight and death of Captain Elliott as recited therein and may be admitted in evidence without further authentication."

"Summary of Facts.

"This is a summary of the facts concerning the death of Captain Donald G. Elliott, FG 3103649 (ANGUS), 159th Fighter Interceptor Squadron, Florida Air National Guard, Imeson Airport, Jacksonville, Florida, in the Atlantic Ocean, off the cost of Florida between St. Augustine and Daytona Beach, on 11 October 1965.

"At about 1330 EST, 11 October 1965, Captain Elliott took off from Imeson Airport alone in F–102A aircraft, SN 56–1358, for an authorized routine training flight. Weather was good. He was instructed to climb to 25,000 feet, proceed southeast for 50 nautical miles, turn north until he was 50 nautical miles north of the field, at which point he was to call Jacksonville Approach Control on the aircraft radio and practice VFR approaches at Imeson Airport.

"At about 1356 the following radio transmissions were received in, and sent by, Imeson control tower:

" 'Mayday, Mayday, Mayday—Echo Hotel–76.' (EH–76 was the identification call sign of Captain Elliott's aircraft.)

"Tower: 'EH–76, Jax tower, go ahead.

"EH–76: 'I'm in a spin going through fifteen thousand uncontrollable.

"Tower: 'Understand in a spin passing fifteen thousand uncontrollable. What is your present position, please?

"EH–76: 'Presently, fifty miles on 150 degree radial.

"Tower: 'Fifty miles, 150 degree radial.

"EH–76: 'Roger I'm punching out.'

"This conversation took about 43 seconds and ended at 1356:33 EST.

"Jacksonville Center immediately notified the appropriate rescue authority of the fact that Captain Elliott was bailing out of his aircraft and the approximate location. The Naval Air Station, Jacksonville, launched a standby helicopter and requested a helicopter launch from the naval station at Mayport and the naval station at Cecil Field.

"At 1407 EST the rescue helicopter from Mayport was airborne. The other two helicopters took off shortly thereafter but were not involved in the rescue attempt. The helicopter from Mayport, manned by four Naval Rescue personnel, reached the downed pilot at about 1435 EST. The F–102A aircraft was not seen.

"The helicopter crew observed that the pilot's head was one foot or more underneath the surface of the water. Navy rescue man Norman W. Chatman, HM 1 (SS) AC, USN, Mayport Naval Station, was instructed by the helicopter pilot F. E. Lewis, ATC/AP, USN, Mayport Naval Station, to jump in the ocean to assist the pilot. Chatman immediately jumped from the helicopter, swam to the pilot and attempted to lift him into the pilot's life raft which was floating near the pilot. The weight of the pilot's parachute and gear prevented this action. The helicopter was brought overhead and a hoist hook was dropped to Chatman. Using the hoist hook the pilot was lifted out of the water and up to the helicopter. Lines holding the pilot's gear were cut and he was brought into the helicopter.

"Artificial respiration was attempted, but after about 20 minutes it was stopped because it was apparent that the pilot was dead. The helicopter crew delivered the pilot's body to the Naval Air Station, Jacksonville, Hospital.

"During the removal of Captain Elliott from the sea, Chatman was assisted by two other Naval Rescue men in the helicopter, Joyce E. Cummings, ANS 3, USN, and James E. Davis, ADR–3, USN, Mayport Naval Station.

"An autopsy was performed on Captain Elliott and it was determined that the sole cause of death was drowning.

"The wreckage of the aircraft was recovered 17 days later about 50 miles southeast of Imeson Field in about 50 feet of water. Examination of the wreckage by expert personnel did not reveal any evidence of material failure.

"The pilot's ejection seat, parachute, and life raft were recovered shortly after the pilot was picked up. A thorough analysis was made of the survival gear and the other evidence, by a Board of well-qualified investigators, who determined that the following occurred:

"Captain Elliott ejected from the aircraft at about 3,000 feet. His parachute opened. He inflated his 'Mae West' life preserver. His one-man life raft inflated properly and dropped beneath him on its lanyard as he descended toward the water. Captain Elliott was not injured during the ejection from the aircraft and he was not injured when he entered the water. At sometime, either during the descent or after entry into the water, he became entangled with the shroud lines of his parachute. He used his pilot's knife to cut several of the shroud lines. He removed his right boot and his gloves.

"In the water, some of the shroud lines were entangled on his right leg and ankle. In reaching down to clear his ankle he caused his life preserver to move from its normal position on his chest and under his chin to a position under his armpits. In this position it was extremely difficult for him to raise his head above the surface. When the Naval Rescue man jumped in beside him, Captain Elliott was drowned, with his head beneath the water, his feet down, and his arms outstretched. His life preserver

was working properly, except for being out of its proper position on his body.

"There were no other witnesses at the scene."

Both the plaintiffs and the defendant moved for summary judgment on the foregoing admitted facts. The plaintiffs also established by their affidavits that Captain Elliott was a strong and excellent swimmer, and since childhood had been able to swim "great lengths"; that he served in the United States Air Force for six and one-half years, during which period he took various survival courses; including a sea survival course of approximately two weeks' duration. The plaintiffs also offered the affidavit of technical Sergeant Danny E. Morris which established his familiarity with water survival and with life saving equipment. Sergeant Morris' affidavit continued:

"Based upon his background and familiarity with survival equipment, the affiant avers that the slipping of the life jacket as described in this said summary is not an ordinary, usual or anticipated occurrence, nor is it a result which is naturally or normally to be expected to follow from the use of such a life jacket. The affiant further states that the normal and expected operation of this life jacket is to hold the head of a pilot out of the water even if he is injured in ejecting or descending. Based upon his background and experience, the affiant states that the slipping of the life jacket of Captain Elliott as set out in the aforesaid summary could not result from the usual or ordinary use

of this life jacket, but, in his judgment and opinion, could occur only as the results of an intervening accidental cause."

The defendant assigned some thirteen grounds of objection to Sergeant Morris' affidavit, and the district court, without indicating the ground on which it relied, sustained the defendant's objection. Later the court denied the plaintiffs' motion for summary judgment and granted the defendant's motion, except for ordering the return of $849.20 representing the premiums paid on the insurance policy.[1]

If Sergeant Morris' affidavit were admitted for any purpose other than its possible aid to the court in its determination of whether there was a genuine issue as to any material fact and whether the moving party was entitled to a judgment as a matter of law,[2] its admission would necessitate a denial of the defendant's motion for summary judgment, for the weight to be accorded true opinion evidence is always for the jury or other trier of the facts.[3] In other words, if opinion evidence is relevant, then the case is simply not one to be determined on motion for summary judgment. Perhaps for that reason Rule 56(e) does not allow the admission of opinion evidence, but provides that "supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Rule 56(e), Fed.R. Civ.P.[4]

---

1. The reason for ordering the premiums returned does not appear. No cross-appeal was taken and the appellee raises no objection to returning the premiums.

2. See rule 56(c), Fed.R.Civ.P.; Palmer v. Chamberlin, 5 Cir. 1951, 191 F.2d 532, 539, 540, 27 A.L.R.2d 416.

3. New York Life Ins. Co. v. Johnston, 5 Cir. 1958, 256 F.2d 115, 118; Mound Company v. Texas Company, 5 Cir. 1962, 298 F.2d 905, 910; 31 Am.Jur.2d, Expert and Opinion Evidence, § 181, pp. 744, et seq.; 32 C.J.S. Evidence § 567, pp. 575, et seq.

4. See Jameson v. Jameson, 1949, 85 U.S. App.D.C. 176, 176 F.2d 58, 60; Duane v. Altenburg, 7 Cir. 1962, 297 F.2d 515, 518; Sunbeam Corporation v. S. W. Farber, Inc., S.D.N.Y.1965, 243 F.Supp. 75, 85, 86; Chiplets, Inc. v. June Dairy Products Co., Dist.N.J.1950, 89 F.Supp. 814, 816; Riss & Co. v. Association of American Railroads, Dist.D.C.1960, 190 F.Supp. 10, 17; 3 Barron & Holtzoff Federal Practice & Procedure, Rules ed., § 1237, p. 165, n. 43.

■ Hence, if a party offers opinion evidence on the hearing of a motion for summary judgment, the court must determine in advance whether that evidence would be admissible if the trial were on the merits, and, if so, it must deny the motion for summary judgment. In the present case, the district court ruled on the admissibility of Sergeant Morris' opinions in the light of the stipulated facts that:

> "At sometime, either during the descent or after entry into the water, he became entangled with the shroud lines of his parachute. He used his pilot's knife to cut several of the shroud lines. He removed his right boot and his gloves.

> "In the water, some of the shroud lines were entangled on his right leg and ankle. In reaching down to clear his ankle he caused his life preserver to move from its normal position on his chest and under his chin to a position under his armpits. In this position it was extremely difficult for him to raise his head above the surface. When the Naval Rescue man jumped in beside him, Captain Elliott was drowned, with his head beneath the water, his feet down, and his arms outstretched. His life preserver was working properly, except for being out of its proper position on his body."

■ In the light of those facts, it becomes obvious that the entangled shroud lines and Captain Elliott's movements caused his life preserver to get out of its proper position. Sergeant Morris' opinions become immaterial, ex-

cept for his final "judgment and opinion" that the slipping of the life jacket "could occur only as the results of an intervening accidental cause." In a trial on the merits, the jury would be in better position to make that determination than would Sergeant Morris and his opinion would be of no help.[5] His opinions were therefore inadmissible because some were immaterial and some would have invaded the province of the jury in a trial on the merits and did invade the province of the court in ruling on the motion for summary judgment.

We have devoted a disproportionate part of this opinion to the admissibility of Sergeant Morris' affidavit. That has been occasioned by the slight aid on that point furnished by the parties' briefs. Appellants' brief devotes only one page to the question and appellee's brief ignores it completely. The precise opposite is true as to the ultimate question of the application of the provisions of the policy to the admitted facts. On that question both briefs are excellent. The cases nearest in point relied on by the parties are listed in the margin.[6]

In Massachusetts Mutual Life Ins. Co. v. Smith, supra note 6, Colonel Sumpter Smith, the insured, when last seen alive was starting in a plane on a trip from Puerto Rico to Trinidad. Somewhere in the open sea the plane disappeared and neither the plane nor Colonel Smith's body were ever found. On original hearing we reversed and granted judgment for the insurance company on the motion notwithstanding the verdict. On petition for rehearing Judge Strum strongly adhered to the original opinion, while

---

5. See authorities collected in 31 Am.Jur. 2d, Expert and Opinion Evidence, § 22, pp. 518–521.

6. By the appellants: Massachusetts Mutual Life Ins. Co. v. Smith, 5 Cir. 1951, 193 F.2d 511, on rehearing, 194 F.2d 1006; Bull v. Sun Life Assur. Co., 7 Cir. 1944, 141 F.2d 456, 155 A.L.R. 1014; McDaniel v. Standard Accident Ins. Co., 7 Cir. 1955, 221 F.2d 171; Eschweiler v. General Accident Fire & Life Assur. Corp., 7 Cir. 1957, 241 F.2d 101.
By the Appellee: Rauch v. Underwriters at Lloyd's of London, 9 Cir. 1963,

320 F.2d 525; Hobbs v. Franklin Life Ins. Co., 5 Cir. 1958, 253 F.2d 591; Willingham v. Life & Casualty Ins. Co. of Tenn., 5 Cir. 1954, 216 F.2d 226, 47 A.L.R.2d 1017; Order of United Commercial Travelers of America v. King, 4 Cir. 1947, 161 F.2d 108; Green v. Mutual Benefit Life Ins. Co., 1 Cir. 1944, 144 F.2d 55; Neel v. Mutual Life Ins. Co. of New York, 2 Cir. 1942, 131 F.2d 159; Pittman v. Lamar Life Ins. Co., 5 Cir. 1927, 17 F.2d 370.

Judge Holmes and I voted to grant rehearing and affirm the judgment against the insurance company. Judge Holmes' view was thus expressed:

"The burden of proof was on the insurer to prove that death resulted from an aviation hazard. If the plane was shot down by enemy submarines, the appellee is entitled to recover; the same is true if the plane fell, sank, was never heard of, and Colonel Smith made his way to one of the near-by uninhabited islands, where he died of disease or starvation, as Jennings came very near doing." 193 F.2d at 514.

I concurred in the affirmance on the ground that " * * * the evidence established enough enemy activity in the area traversed by this plane to make a jury question." Thus the reason for affirmance was that the insurance company failed to prove that death resulted from an aviation hazard.

In all of the other cases cited in footnote 6, supra, the aviation exclusion clauses varied from each other and from the policy here involved, but each had the same general purpose to exclude risks peculiar to plane flight. The three additional cases cited in that footnote which are relied on by the appellants all come from the Seventh Circuit.

Bull v. Sun Life Assur. Co., supra note 6, bore some similarity to our *Sumpter Smith* case which has just been discussed. In *Bull* the insured was killed by enemy strafing fire while standing on the fuselage of his disabled seaplane afloat in the ocean after a forced landing. The court found that the sole connection which his death had with the disabled aircraft was that he had arrived at the place where he was killed by way of that airplane.

In McDaniel v. Standard Accident Ins. Co., supra note 6, the insured alighted from a plane forced down in a calm, cold lake without injury and began swimming ashore. Before reaching shore he stopped, went under, and drowned. The court considered it conclusive of the issue that there was no evidence that he sustained injury while in or descending from the plane. If that case is distinguishable from this, it is only because of the different wording of the exclusion clauses. In that case the clause excepted "death * * * resulting directly or indirectly from injury sustained by the insured while in or on any aircraft * * * or * * * descending therefrom or therewith," while here the risk not assumed is "Death resulting from travel or flight in, or descent from or with, any kind of aircraft etc." A careful reading discloses that, though strikingly similar, the two clauses are materially different as to the place of injury.

In Eschweiler v. General Accident Fire & Life Assur. Corp., supra note 6, the policy disclaimed coverage for "any injury, fatal or non-fatal, sustained by the insured while in or on any vehicle or mechanical device for aerial navigation, or in falling therefrom or therewith or while operating or handling any such vehicle or device." It was held that the exclusionary clause did not bar relief where the evidence supported a finding that the insured was not injured in the forced landing of the airplane nor in extricating himself therefrom, but that he died from cardiac failure caused by physical effort in dragging himself to safety in a snowstorm. The court noted that the exclusionary clause is more limited than the one involved in the *McDaniel* case which was discussed in the preceding paragraph. As there disclosed, the clause in the *McDaniel* case is more restrictive as to place of injury than the one involved in the instant case.

The cases most relied on by the appellee and cited in footnote 6, supra, are from the First, Second, Fourth, Fifth and Ninth Circuits. We think it necessary to discuss only the most recent case from this Circuit, because the other cases are in accord with it.

In Hobbs v. Franklin Life Ins. Co., supra note 6, the policy provided:

" 'This policy does not cover disability or loss resulting from * * * ; (b) injury sustained while in or on, or in consequence of having been in or on, any vehicle or device for aerial navi-

gation, or in falling therefrom or therewith, or while adjusting, operating, or handling any such vehicle or device * * *." 253 F.2d 591, 592. The insured was co-pilot of a land-based airplane which developed engine trouble and crashed into the cold waters of the Pacific Ocean off the coast of Oregon. The fuselage of the plane was broken up by the impact. The insured was struck and received a laceration on his forehead, and was rendered temporarily unconscious. However, he quickly revived and left the plane by jumping or falling into the ocean, wearing a life jacket. Approximately two hours after the crash, his body was retrieved fully dressed and still wearing a life jacket. We agreed with the district court that "the death of the insured resulted from an injury sustained in consequence of having been in or on a vehicle or device for aerial navigation." (253 F.2d 593.)

 The provision of the instant policy dealing with the face amount or single indemnity provides that the insurer does not assume the risk of "Death resulting from travel or flight in, or descent from or with any kind of aircraft aboard which the insured is a pilot." The provision dealing with the double indemnity provides that it is not payable "if the death of the insured shall have resulted directly or indirectly from: * * * (4) travel or flight in, or descent from or with, any kind of aircraft aboard which the insured is a pilot * * *." The words "directly or indirectly" add something to several of the other eight causes of death listed in that exclusion clause, but, under the circumstances of this case, they add little or nothing to the force of the word "resulting" as used in the single indemnity provision. For purposes of this case the two provisions may be treated alike.[7]

Each clause is intended to exclude the risks of aviation. Death by drowning after escaping from an airplane downed

in the ocean results from a risk of flight against which the clauses are directed. True, the flight itself had ended before Captain Elliott met his death or was injured. But it ended in an ominous manner. The plane went into a spin and Captain Elliott parachuted to the ocean. During the descent or after entry into the water, he became entangled with the shroud lines of his parachute; in reaching down to clear his ankle, he caused his life preserver to move from its normal position to a position under his armpits. Of course, he did not anticipate that occurrence, but it was nonetheless a result of his efforts to free himself. It was not an independent cause but a link in the unbroken chain of causation. Clearly, the death of Captain Elliott was the result of the aerial flight. The judgment is therefore

Affirmed.

---

7. See Order of United Commercial Travelers of America v. King, 4 Cir. 1947, 161 F.2d 108, 109; Compare Willingham v. Life & Casualty Ins. Co. of Tenn., 5 Cir. 1954, 216 F.2d 226, 227.