**NEW YORK LIFE INSURANCE COMPANY, Appellant,**

v.

**Marian L. ROGERS, Appellee.**

**No. 5111.**

Supreme Court of State of Alaska.

March 5, 1982.

Kenneth P. Jacobus and James F. Klasen, Hughes, Thorsness, Gantz, Powell & Brundin, Anchorage, for appellant.

Stephen Hillard, Graham & James, Anchorage, for appellee.

Before RABINOWITZ, C.J., and CONNOR, BURKE, MATTHEWS, and COMPTON, JJ.

OPINION

RABINOWITZ, Chief Justice.

This appeal arises out of New York Life Insurance Company's refusal to make a $50,000 payment, under an accidental death policy, to Marian L. Rogers as the beneficiary. Resolution of the appeal turns upon the proper interpretation of the policy's "aviation exclusion clause."

Appellee Marian Rogers is the beneficiary of an insurance policy that was issued by New York Life Insurance Company on the life of Dr. William S. Stover.[1] New York Life paid the $50,000 face amount of the policy on proof of Dr. Stover's death; it refused, however, to pay the additional $50,000 demanded by Rogers under the policy's accidental death provision. Rogers subsequently brought suit seeking the $50,000 claimed under the policy.

Both parties moved for summary judgment. In the memoranda accompanying those motions, each party alleged that the other bore the burden of proving the circumstances of Dr. Stover's death; these contentions have not been pursued on appeal. Each party also took the position that its legal theory required no resolution of

---

1. Rogers had previously been married to Dr. William Stover, the insured.

factual issues, but argued that the opposing legal theory, if adopted, would require that factual disputes be resolved. The superior court judge ruled from the bench that Rogers was entitled to partial summary judgment.[2]

The circumstances surrounding Dr. Stover's death are not known and can only be filled in inferentially from the few details that are available. At about 4:00 a. m. on April 15, 1978, Dr. Stover and two of his children left Anchorage in his Cessna 170B airplane, intending to spend the day fishing in Homer. Dr. Stover was an experienced pilot but was not certified for instrument flight. The required annual inspection of his aircraft had not yet been performed for the year 1978, and the plane was not equipped with flotation gear. Weather conditions in Anchorage and Kenai on the morning of April 15, 1978, were such as to present extremely hazardous flying conditions.

Shortly after takeoff, Dr. Stover began trying to contact airport ground control on the plane's radio. Over the course of the next twenty minutes, some ten separate transmissions from Dr. Stover were received by ground control personnel in Anchorage and Kenai, but numerous attempts to return the calls were unsuccessful, presumably because the radio receiver in his plane was malfunctioning. Statements of

the persons who heard Dr. Stover's radio transmissions indicate that he did not appear to be having difficulty at that time. After these unsuccessful attempts to make contact, no further communication was received from Dr. Stover.

When Dr. Stover was reported missing at approximately 5:45 p. m. on that day, an intensive search was initiated. The search was actively pursued for ten days; 425 sorties over the Kenai Peninsula, Cook Inlet, and the Resurrection Pass area, flown by both military and civilian aircraft, failed to turn up any trace of the missing plane. Because weather conditions on the morning of April 15 were likely to have forced Dr. Stover to select an air route primarily over Cook Inlet, New York Life concludes that Dr. Stover's plane must have crashed and sunk in the waters of the Inlet. Further support for this conclusion is provided by the fact that Dr. Stover's body was recovered from the Inlet on June 19, 1978, in a condition that was consistent with its having been immersed in cold water for over two months.[3] The body did not evidence any sign of the kind of injury that would have been expected had a violent impact occurred; New York Life argues that this fact also supports its conclusion in that a landing on water would not have produced the violent impact associated with crashes

2. In seeking summary disposition of the case, Rogers abandoned her claim for punitive damages. Her motion was therefore one for partial summary judgment only, and the superior court's order entitled her to the $50,000 claimed under the policy but no damages beyond that.

3. The autopsy report reads in part:
The remains are those of a Caucasian male who has undergone severe post mortem decomposition and immersion change. There are multifocal areas of predation by aquatic animal life. The skin of both extremities, back and head has been multifocally attacked by animal life. Both arms have the bones bared of flesh. The chest has an area of intact Caucasian skin over the midline of the sternal region measuring up to 2 cm. in diameter. Intact Caucasian skin is also identified in the groin and perineal region. The remains have a pair of dark knit stockings, shreds of thermal knit long underwear, cotton knit briefs and corduroy type pants. Appropriate samples are saved from each of these clothing materials. The upper trunk is not covered by a garment. There is no external sign of injury or violence.

Dr. Propst, the pathologist who performed the autopsy, stated that he believed the body "stayed in the water the entire time." This opinion was based on the "severe degree of [immersion] change . . . coupled with a lack of . . . external environmental kind of changes." Dr. Propst was also of the opinion that "[i]t wasn't until the Cook Inlet waters got into June that the waters got warm enough for the postmortum bacteria to form enough gas to float the body to subsurface or near the surface," and agreed that it was possible that "the body was on the bottom of the Inlet until maybe a week or so before it was found." The body was discovered entangled in the branches of a tree that had floated against a drilling rig support tower in Cook Inlet near Homer.

on land. New York Life's claim is that the only reasonable inference to be drawn from these facts is that Dr. Stover died from exposure or by drowning, either of which may have been accelerated by a soft tissue injury, shortly after his plane landed in Cook Inlet. As indicated at the outset, we think that any suggested evidentiary disputes are of no consequence and that our decision rests entirely upon the proper interpretation of the "aviation exclusion clause." [4]

Rogers' theory, simply put, is that the policy can be reasonably interpreted to exclude "only those deaths and injuries which occurred in the air or upon direct impact, but not those which occurred subsequent to the termination of the flight." New York Life's position is that all deaths resulting from "those risks associated with aviation" are excluded.[5] Since the facts as presented by both parties indicate that Dr. Stover's death occurred subsequent to the termination of the flight, the disputes as to whether death was caused by drowning or hypothermia, and whether a soft tissue injury may have occurred, are largely irrelevant.[6]

The provision of the life insurance policy upon which Rogers bases her claim reads as follows:

> Subject to the terms and conditions of the policy and these Accidental Death Benefit provisions, the Company will pay the Accidental Death Benefit, as part of the policy's death benefit proceeds, upon receipt of due proof that the Insured's death resulted directly, and independently of all other causes, from accidental bodily injury . . . .

New York Life does not question the applicability of this provision. Its refusal to pay the accidental death benefit was based, instead, on the following aviation exclusion clause:

> However, the Accidental Death Benefit will not be payable if death occurs before the Insured's fifth birthday or results from . . . (c) travel or flight in any kind of air craft (including falling or otherwise descending from or with such aircraft in flight) while the Insured is participating in aviation training in such aircraft, or is a pilot, officer or other member of the crew of such aircraft or has any duties aboard the aircraft while it is in flight if such duties relate in any way to the aircraft, its operation or equipment, or to any purpose of the flight . . . .

The parties to this appeal have adopted radically differing positions regarding the proper interpretation of this aviation exclusion clause. New York Life's position is that the words used in its exclusion clause, "taken in their plain, ordinary and popular sense, . . . clearly exclude from coverage

---

**4.** Rogers insists that a large part of the evidence upon which the above statement of facts is based was not properly before the superior court. Her position is:

> There is only one essential material fact in this case: the immediate cause of Dr. Stover's death was 'probable hypothermia.' The actual events surrounding that immediate cause of death are completely and totally unknown. In order to avoid liability, the defendant has attempted to fill this factual void by spinning a tale: Dr. Stover's plane crashed into the waters of Cook Inlet, where he inevitably perished within a very few minutes in the cold waters. An equally fanciful tale would be that Dr. Stover's plane landed in the waters of Cook Inlet just offshore. Dr. Stover swam safely to shore. Then, in an attempt to save his children, Dr. Stover swam back out to where the plane had been and eventually succumbed to hypothermia. One could also speculate that Dr. Stover survived an as yet undiscovered landing of the plane on the Kenai Peninsula. He thereafter attempted to cross a river on a tree and, due to the river current, was swept into the Cook Inlet.

Although it is true that presentation of some of New York Life's evidence at oral argument on the summary judgment motion was procedurally irregular, Rogers' assertion that New York Life "seeks to replace fact with fantasy" is unfounded.

**5.** Rogers has also stated her theory in the following manner: "[O]nce the insured got out of the plane uninjured, any injuries incurred after that point in time did *not* 'result from . . . travel or flight in any kind of aircraft . . . while the insured [was] a pilot.'"

**6.** After summary judgment was entered against it, New York Life, asserting that it had raised a triable issue of fact, moved for reconsideration. This motion was denied.

such risks as death by drowning or hypothermia as a result of a plane crash in the ocean." [7] It asserts that the courts that have considered the problem have been "virtually uniform" in adopting that interpretation. Our review of the applicable decisions and law supports that assertion.

The analysis applied by the Fourth Circuit in *Order of United Commercial Travelers v. King*, 161 F.2d 108, 109 (4th Cir. 1947), is typical:

> In undertaking an aerial flight over the ocean in a land-based plane, man must reckon with the perils of the sea which are as imminent and real as the unrelenting force of gravity. Just as flight over the land brings forth the danger of violent collision with the earth, we have the dangers of the sea in over-water flight. That men may remain alive for varying periods of time before succumbing does not change the picture. We think it a rather violent fiction to say that death, under such circumstances, comes from accidental drowning. Common knowledge and experience fairly shout of the dangers of shock, exposure and drowning when a flight is taken over water in the winter time in a land based plane.

Numerous courts have relied upon this passage from *King* in interpreting policy exclusions similar to the one in issue here. *See, e.g., Prudential Insurance Co. of America v. Howe*, 232 Ga. 1, 205 S.E.2d 263, 264 (1974); *Goforth v. Franklin Life Insurance Co.*, 202 Kan. 413, 449 P.2d 477, 482 (1969); *Howard v. Equitable Life Assurance Society of the United States*, 360 Mass. 424, 274 N.E.2d 819, 821 (1971). The overwhelming majority of cases in which this issue has been presented have reached a similar result.[8]

Rogers insists that the aviation exclusion clause under consideration here is ambiguous and that "[o]ne reasonable interpretation of this language is that it excludes from coverage only a death which occurred while the insured was acting as a pilot, and which occurred in the time period between the liftoff and the touchdown of the plane." Primary reliance is placed on the asserted ambiguity of the policy's exclusion of any death which "results from" the insured's participation in the flying of a plane.[9] Rogers argues that the narrowest reasonable interpretation of the policy's causation language must be adopted. Applying such an interpretation to the facts of this case renders the exclusion inapplicable, she argues, since "Dr. Stover's death was not the 'result' of travel or flight ... but [resulted] from the post-flight peril of hypothermia (or *arguendo* from drowning)." In our opinion the cases cited by Rogers do not support such a restrictive reading of the policy's aviation exclusion clause.

*Chambers v. Kansas City Life Insurance Co.*, 156 Cal.App.2d 265, 319 P.2d 387 (1957), required interpretation of an exclusion clause similar to the one at issue here.[10] That case involved a landing in the California desert; the insured was apparently not

**7.** This court has held that an insurance policy must be construed so as to "provide the coverage which a layperson would have reasonably expected, given a lay interpretation of the policy language." *Stordahl v. Government Employees Ins. Co.*, 564 P.2d 63, 65–66 (Alaska 1977). *See also, United States Fire Ins. Co. v. Colver*, 600 P.2d 1, 3 (Alaska 1979); *Hahn v. Alaska Title Guar. Co.*, 557 P.2d 143, 145 n.5 (Alaska 1976); *Continental Ins. Co. v. Bussell*, 498 P.2d 706, 710 (Alaska 1972).

**8.** *See* Annot., 62 A.L.R.3d 1243, 1250–59 (1975).

**9.** Rogers also asserts that the phrase "travel or flight" is ambiguous and that the reference to "falling or otherwise descending from or with such aircraft in flight" requires coverage for any death that occurs after impact. Inasmuch as this argument ignores the policy's clear statement that any death that "results from" such "travel or flight ... (including falling or otherwise descending ...)," we think it should be summarily rejected. Likewise, we think the attempt to limit the scope of the exclusion to death occurring "while the Insured ... is a pilot" is devoid of merit: any death that "results from" travel in a plane piloted by the insured is clearly excluded.

**10.** That provision excluded life insurance coverage "[i]f the insured shall die as a result, directly or indirectly, of service, travel or flight in any species of aircraft, or as a result of descending therefrom or therewith." *Chambers v. Kansas City Life Ins. Co.*, 156 Cal. App.2d 265, 319 P.2d 387 (1957).

injured in the landing, but died of "exposure, dehydration, [and] exhaustion" after walking twenty miles over the course of two days. In affirming a jury verdict in favor of the insured's beneficiary, the court noted that the clause could reasonably be read "to indicate an intention that the exclusion provided for would end when the insured had safely descended from the plane." *Id.* 319 P.2d at 389. It concluded:

> [I]t does not necessarily follow that this exclusion provision was intended to apply where a safe landing had been made and where death occurred a couple of days later and miles away from the airplane, as a result of other circumstances and conditions.

*Id.* The court's view was that the forced desert landing was too remote a cause of the insured's death to justify exclusion from coverage. Most significantly, the cases involving a forced landing in a body of water were carefully distinguished:

> It does not necessarily follow that the same rule should be applied here as that applicable where a plane lands on the ocean where the drowning may well be considered an indirect, if not a direct, result of the flight. Where a plane goes down at sea a safe descent is often impossible, and drowning which follows is in a practical sense a part of the descent. In a forced landing on terra firma within this country a very different situation may well appear.

*Id.* 319 P.2d at 389. We think this distinction significantly undermines Rogers' reliance on the *Chambers* case.[11]

Rogers further argues that if the insurer had intended to exclude death occurring after termination of a flight from coverage, it was obligated to use express language to that effect. *See INA Life Insurance Co. v. Brundin*, 533 P.2d 236, 242–43 (Alaska 1975). This argument adds nothing to the foregoing, in that it begs the central question presented by this appeal—whether "results from" can be reasonably interpreted to refer only to deaths occurring at, or prior to, impact. It also ignores the fact that the language contained in New York Life's exclusion tracks the statutory language permitting such exclusions. AS 21.45.-250(a)(2)(B) specifically authorizes exclusion from life insurance coverage of a death that occurs "as a result of aviation or any air travel or flight." It is clear that any exclusion from coverage broader than that allowed by statute would be illegal, AS 21.45.-250(a)(2), and that New York Life was precluded from using language broader than that it selected. We therefore find Rogers' argument unpersuasive.

Given the persuasive case law from the other jurisdictions, we agree with New York Life's contention that the policy provision in issue here should be interpreted to exclude from coverage a death by drowning that results from an emergency landing in a body of water. The question whether such a death "results from" travel in an airplane must be answered by applying a reasonable interpretation of that phrase to the facts presented. We hold that under any reasonable lay interpretation of the insurance policy in question, Dr. Stover's death must be

---

**11.** *Security Mutual Life Ins. Co. v. Hollingsworth*, 459 P.2d 592 (Okl.1969), is somewhat more to the point. It, like *Chambers*, involved an aviation exclusion to life insurance coverage that was similar to the one under consideration. In *Hollingsworth*, the insured was a passenger in a small plane that crash-landed, without causing injury to the occupants, in a lake approximately two hundred yards from shore. Although two of his three companions managed to swim safely to shore, the insured drowned, apparently because he had become entangled in a set fishing line. On appeal from a jury verdict finding the insurer liable, the court found on these facts that "not all reasonable men would agree the act prohibited by the

exclusion clause had any causative connection ... with insured's death." *Id.* at 599.

*Although McDaniel v. Standard Accident Insurance Co.*, 221 F.2d 171 (7th Cir. 1955), relied upon by Rogers, is closer to the present case on its facts, the language of the aviation exclusion clause in that case differs substantially enough from that at issue here to render *McDaniel* inapposite. Further, the Seventh Circuit's reasoning could render the exclusion inoperable in most cases involving water landings. We think it unreasonable to enforce an exclusion in the case of an aviator who expires from impact-related injuries shortly after a land crash but to refuse enforcement when an aviator drowns as a direct result of a crash in a body of water.

excluded from the accidental death coverage because it "result[ed] from ... travel or flight in ... [an] aircraft ... while the Insured ... [was] a pilot." Because the superior court erred in accepting Rogers' interpretation of the life insurance policy provisions upon which she bases her claim, the superior court's entry of summary judgment in her favor must be reversed. Since the case presents no triable issue of fact,[12] the proper interpretation of the aviation exclusion clause in question requires that summary judgment be entered in favor of New York Life.[13]

REVERSED.

12.  Assuming, as New York Life argues, that Dr. Stover's death from hypothermia or drowning is excluded from coverage if it "resulted from" his flight, the only question to be determined is whether these facts place the death beyond the scope of a reasonable lay interpretation of the policy's provisions. In other words, given New York Life's interpretation, summary judgment in its favor is appropriate unless reasonable minds could conclude that a survival period of five or six hours, perhaps sustained by clinging to a floating tree, would indicate that death did not "result from" the forced landing in Cook Inlet. Reasonable minds could not reach that conclusion, and several courts have so held.

In *King*, the victim was not injured in the crash and survived, floating in a life jacket, for at least two and a half hours; and the court held as a matter of law that death "resulted from" the crash. *Order of United Commercial Travelers v. King*, 161 F.2d 108, 108–10 (4th Cir. 1947). Summary judgment in favor of the insurer was affirmed, on the same ground, in *Goforth*; in that case the victim's body was never located. *Goforth v. Franklin Life Ins. Co.*, 202 Kan. 413, 449 P.2d 477 (1969). In *Prudential Ins. Co. of America v. Howe*, 232 Ga. 1, 205 S.E.2d 263 (1974), summary judgment for the insurer on the same ground was affirmed when the victim was known to have survived for at least six hours. *See also Elliott v. Massachusetts Mutual Life Ins. Co.*, 388 F.2d 362 (5th Cir. 1968); *Howard v. Equitable Life Assurance Society*, 360 Mass. 424, 274 N.E.2d 819 (1971).

13.  We have reviewed Rogers' arguments concerning New York Life's noncompliance with Civil Rules 56 and 77 and find them without merit. Even assuming procedural irregularities occurred, in the context of this case any failure to comply with our Rules of Civil Procedure was harmless error.